UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
|     1300 Desert Willow Road, LLC, | Case No. 25-11375 (PB) |
| Debtor. | **FOR PUBLICATION** |

------------------------------------------------------------x

# DECISION ON COMPETING PLANS AND DISCLOSURE STATEMENTS OF THE DEBTOR AND ROMSPEN INVESTMENT LP

**APPEARANCES:**

BRONSON LAW OFFICES, P.C.
*Counsel for the Debtor*
480 Mamaroneck Avenue
Harrison, NY 10528-0023
By: H. Bruce Bronson, Jr.

BRYAN CAVE LEIGHTON PAISNER LLP
*Counsel for Romspen Investment LP*
301 S. College Street, Suite 2150
Charlotte, NC 28202
By: Jarret P. Hitchings

WILSON SONSINI GOODRICH & ROSATI
*Counsel for Pacific Fusion Corporation*
222 Delaware Ave., Suite 800
Wilmington, DE 19801
By: Erin R. Fay

UNITED STATES DEPARTMENT OF JUSTICE
*Counsel for the Office of the United States Trustee*
One Bowling Green
New York, NY 10104
By: Shara C. Cornell

**Hon. Philip Bentley**
**U.S. Bankruptcy Judge**

This case raises a question that occasionally arises in chapter 11 practice but has received surprisingly little attention in the reported case law: What should a bankruptcy court do when exclusivity has expired and two competing plans have been filed? In particular, if one of the proposed plans appears materially more likely to achieve confirmation than the other, should the court hold the less promising plan in abeyance while permitting the more promising plan to proceed to a confirmation hearing?

Section 105(d) of the Bankruptcy Code provides useful guidance on this issue. It gives the bankruptcy court broad discretion to control the timing of plan solicitation by the debtor and other proponents, including the power to prescribe "such limitations and conditions as the court deems appropriate to ensure that the case is handled expeditiously and economically." 11 U.S.C. § 105(d)(2). In some cases, the court may decide that these goals are best furthered by allowing the concurrent solicitation of competing plans or, alternatively, by putting a creditor's plan on hold while giving the debtor the first opportunity to confirm its plan. In this case, however, the Debtor's plan is problematic in multiple serious respects. In contrast, the competing plan filed by the Debtor's secured creditor is simple and readily confirmable. In these circumstances, the Court concludes that it is appropriate to hold the Debtor's plan in abeyance while the secured creditor's plan proceeds to a confirmation hearing.

## FACTUAL & PROCEDURAL BACKGROUND

**The Debtor and the Property**

The Debtor is a single-asset real estate entity, which was formed to acquire a property (the "Property") located at 1300 Desert Willow Road, Los Lunas, New Mexico. The Property, which is the Debtor's sole asset, is a light industrial manufacturing facility located in the Los Morros Business Park, an industrial and distribution hub that also hosts a Walmart Distribution Center and a Facebook data center. The Debtor is a New York limited liability company that is wholly owned by a holding company, Corniche Sry, LLC ("Corniche Sry"), which itself is wholly owned by Mr. David Ebrahimzadeh, a real estate investor.

2

The Debtor acquired the Property in 2021. In April 2022, the Debtor refinanced its debt by taking out a loan, secured by a first mortgage on the Property, in the approximate amount of $20 million from a real estate investment firm by the name of Romspen Investment LP ("Romspen"). Later that year, the Debtor's fortunes took a downturn. A number of tenants vacated the Property, leaving it more than 50% vacant. From that time until the Debtor filed for bankruptcy in June 2025, the Property was occupied by only one substantial tenant. In the fall of 2022, the Debtor failed to make payments due under its Romspen loan, and that loan became fully due and payable.

In early 2023, on Romspen's motion, a New Mexico state court appointed a receiver, who took control of the Property. Later that year, Romspen posted the Property for a non-judicial foreclosure sale. That sale was repeatedly postponed pursuant to a number of forbearance agreements, but after about two years, Romspen refused to continue to forbear. On June 20, 2025, shortly before the scheduled foreclosure sale, the Debtor filed its chapter 11 petition.

**The Chapter 11 Case**

From its inception, this bankruptcy has largely been a two-party dispute between the Debtor and Romspen. Romspen is the Debtor's sole secured creditor, and it may be the Debtor's only substantial creditor of any sort, secured or unsecured. As of the petition date, the Debtor owed Romspen approximately $26 million, consisting of about $20 million of principal and $6 million in interest, late fees and legal expenses.

Only one other substantial claim against the Debtor has been filed: a claim in the approximate amount of $18 million filed by an entity known as Equity Funding LLC ("Equity Funding") for monies loaned at the time the Debtor acquired the Property. Romspen has objected to the claim, contending that it should be disallowed in its entirety or, alternatively, recharacterized as equity. Romspen contends that the documents annexed to Equity Funding's proof of claim show that Equity Funding advanced monies

3

not to the Debtor, but instead to a non-debtor entity created to finance the Debtor's acquisition of the Property. Romspen's objection to this claim is scheduled to be heard next month.

Apart from the claims asserted by Romspen and Equity Funding, there are only two other claims against the Debtor, both for legal fees owed to the Debtor's prior law firms. The Debtor concedes that it owes one law firm, Meltzer, Lippe, Goldstein & Breitstone ("Meltzer Lippe"), about $50,000 for pre-petition legal fees. In addition, a second law firm, Cadigan Law Firm PC ("Cadigan"), filed a proof of claim for almost $9,000.

Early in this bankruptcy, Romspen moved to dismiss the case or to appoint a chapter 11 trustee, arguing that the Debtor filed its petition in bad faith. Romspen also sought relief from the automatic stay and objected to the Debtor's use of cash collateral. The Court denied the motion to dismiss or appoint a trustee. The motion for relief from stay and the cash collateral motion were adjourned without date by Romspen and the Debtor, who entered into a series of agreed interim cash collateral orders.

Since the filing of the bankruptcy, two significant developments affecting the Debtor's business have occurred—one positive, the other negative. The positive development was that, in September 2025, the Debtor secured a new tenant, which entered into a multi-year lease for a large portion of the Property. That lease was approved by order of the Court in November 2025. As a result, the Property is now fully occupied. This development materially improved the Debtor's financial condition and the value of the Property. Both the Debtor and Romspen now estimate the Property to be worth $40 million or more.

The negative development was that, in December 2025, the Debtor's principal, Mr. Ebrahimzadeh, was named in a federal indictment filed in the District Court for the District of Massachusetts (Case No. 25-10455-RGS). The indictment charges Mr. Ebrahimzadeh with six felony counts of bank and wire fraud. Specifically, he is charged with fraudulently obtaining more than $8 million in pandemic relief loans over a 2-and-a-half-year period through at least 15 defunct or otherwise

ineligible companies, which he owned and controlled through his principal holding company, Corniche Capital, LLC ("Corniche Capital").

**The Two Competing Plans of Reorganization**

Before the Court are two plans of reorganization: an amended plan filed by the Debtor (the "Debtor's plan"), and a competing plan filed by Romspen ("Romspen's plan") after the Debtor's exclusive period to obtain acceptances of its plan lapsed. The Debtor and Romspen have each filed a motion asking this Court to approve their disclosure statement and to set a schedule for their plan to proceed to confirmation.

The Debtor's plan is a reorganization plan, which would cram down Romspen's mortgage by paying it over a ten-year period at a reduced interest rate. Specifically, the Debtor would pay Romspen's approximately $26 million loan balance over ten years, at an interest rate of 6.99% per year—a substantial reduction from the 11.25% pre-default rate and 18% default rate provided by Romspen's loan agreement. Allowed non-principal charges would be paid without interest over the same ten-year period. Corniche Sry, the holding company through which Mr. Ebrahimzadeh owns the Debtor, would receive a 100% equity interest in the reorganized Debtor in exchange for making a $50,000 contribution.

The Debtor's plan would create a single general unsecured creditor class, consisting of the $18 million Equity Funding claim and the two much smaller law firm claims, and would pay each of these claims, if allowed, in full and in cash. The timing of these payments would vary: The two law firm claims would be paid on the effective date, but Equity Funding's claim would not be paid until there is a sale, refinancing or other disposition of the Property, or of interests in the Debtor, which could take years. Equity Funding would be paid interest at 3% per year as compensation for this delay.

Romspen's plan, in contrast, is a simple liquidating plan. It provides for the appointment of a plan administrator to oversee the marketing and sale of the Property, after which creditors will be paid in order of priority out of the cash reserve currently held by the Debtor, plus the net proceeds of the sale. If any

5

monies remain after all creditors are paid in full, the remaining funds will be distributed to the Debtor's equity holder. Romspen's plan contemplates that all allowed claims, including Equity Funding's claim if allowed, will be paid in full on or before the effective date. At the same time, it is a waivable condition to the effective date of this plan that Equity Funding's claim be disallowed. The plan provides that every class is unimpaired and that, as a result, no solicitation will be needed.

On February 12, 2026, the Court heard argument on those two motions and held a status conference to discuss the best path forward in this case. Neither the Debtor nor Romspen presented any evidence at the hearing; instead, each rested on its motion papers and the prior filings in this bankruptcy.

The Debtor does not object to the adequacy of Romspen's disclosure statement or to the Court allowing Romspen to proceed toward confirmation; the Debtor merely reserves its right to object to confirmation of Romspen's plan. Romspen, for its part, contended in its motion papers that the Debtor's plan was unconfirmable on its face and asked the Court to deny approval of the Debtor's disclosure statement on that and other grounds. At the hearing, Romspen conceded that the Debtor's plan is not facially unconfirmable, arguing instead that that plan is highly unlikely to be confirmed.

## DISCUSSION

For the reasons discussed below, the Court will approve the disclosure statement for Romspen's plan and set a schedule to consider confirmation of that plan. However, the Court will not approve the Debtor's amended disclosure statement or permit the Debtor's plan to proceed toward confirmation at this time.

### I.  The Governing Legal Standard

The right to file a plan of reorganization is governed by section 1121 of the Bankruptcy Code. Section 1121(b) provides that a chapter 11 debtor has the exclusive right to file a plan during the first 120 days of the bankruptcy. Section 1121(c) provides that, once exclusivity expires, "[a]ny party in

interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, or an equity security holder, or any indenture trustee" may file a plan. *See* 11 U.S.C. § 1121(b),(c). Thus, section 1121 expressly contemplates the possibility that multiple competing plans may be on file at the same time, but it says nothing about how the court should manage the confirmation process when more than one plan is pending.

Section 105(d) provides useful guidance. Subsection (1) of that section provides that the court, on its own motion or on request of a party in interest, "shall hold such status conferences as are necessary to further the expeditious and economical resolution of the case." *See* 11 U.S.C. § 105(d)(1). Subsection (2) provides that the court, "unless inconsistent with another provision of this title or with applicable Federal Rules of Bankruptcy Procedure, may issue an order at any such conference prescribing such limitations and conditions as the court deems appropriate to ensure that the case is handled expeditiously and economically." 11 U.S.C. § 105(d)(2). Subsection (2)(B) sets forth a non-exclusive list of matters that such an order may address in a chapter 11 case. Most notably, such an order may set the date by which the debtor or another party in interest may file a disclosure statement and plan, *see* 11 U.S.C. § 105(d)(2)(B)(i), (iii), as well as the date by which the debtor or another plan proponent may solicit acceptances of a plan, *see* 11 U.S.C. § 105(d)(2)(B)(ii), (iv).

These provisions give the bankruptcy court broad discretion to structure a competing plan process in the way it believes is most likely to further the goal identified at the outset of section 105(d)(2): "to ensure that the case is handled expeditiously and economically." In some cases, this may mean permitting concurrent solicitation of two competing plans, followed by a joint confirmation hearing on the two plans. *See* 11 U.S.C. § 1129(c) ("If the requirements of subsections (a) and (b) of this section are met with respect to more than one plan, the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm."). In other cases, the court may conclude that the

expeditious and economical resolution of the case is better served by holding one plan in abeyance while permitting the other plan to move forward.

The case law addressing this issue is surprisingly sparse. The most thoughtful discussion of the issue of which the Court is aware is contained in a 30-year-old decision by a Colorado bankruptcy court, *In re Aspen Limousine Serv., Inc.*, 187 B.R. 989 (Bankr. D. Colo. 1995), *aff'd*, 193 B.R. 325 (D. Colo. 1996). In that case, after the bankruptcy court had approved the debtor's disclosure statement and authorized solicitation of its plan, a creditor asked the court to do the same for its competing plan and to allow the two plans to proceed on parallel tracks. The court approved the creditor's competing disclosure statement but put that plan on a slower timeline, rejecting the creditor's argument that the two plans should move forward in tandem. The court observed:

> Section 105, coupled with the terms of Sections 1121 and 1125, suggests that this Court can look to equitable factors to fix a time schedule as may be necessary to keep the [confirmation] process fair, fast, effective, and efficient.
>
> Section 105(d)(2) lets this Court "mix and match" the opportunities and timing for a debtor, creditors, and parties-in-interest, to file plans and disclosure statements, and solicit acceptances of such plans. It is an omnibus provision with which the Court can customize Chapter 11 preconfirmation procedures, as long as those procedures are not inconsistent with other provisions of the Code.

*Id.*, 187 B.R. at 995.[1]

The facts of *Aspen Limousine* differ significantly from those of this case, but these differences do not undercut the relevance of the court's discussion of section 105(d)(2). In particular, the debtor in *Aspen Limousine* was a small business debtor, and much of the court's discussion addressed Code sections specific to cases of that sort. Nevertheless, the court's discussion of the discretion that section 105(d)(2)

---

[1] Other than *Aspen Limousine*, few reported decisions contain much discussion of how the court should manage a competing plan process. *See, e.g., In re Sunflower Racing, Inc.*, 218 B.R. 972, 977 (D. Kan. 1998) (citing *Aspen Limousine* with approval and dismissing appeal from bankruptcy court decision declining to consider creditor's competing plan); *In re Harcom, Inc.*, 79 B.R. 137 (Bankr. D.N.H. 1987) (deferring approval of debtor's disclosure statement pending confirmation hearing on competing plan).

8

gives courts to manage competing plans so as to promote an expeditious and economical resolution applies equally to all chapter 11 cases, not just small business cases.

In addition, the plan to which the court gave primacy in *Aspen Limousine* was the debtor's plan, not the creditor's. The court found that allowing the debtor's plan to be voted on first comported with a basic chapter 11 principle: "Underlying the Bankruptcy Code is the general principle that an honest and diligent debtor should be given a first opportunity to get a plan confirmed and do so in the most cost-effective manner possible." *Id.* at 993. This Court agrees that, in many cases, it is appropriate to give primacy to a plan proposed by an "honest and diligent debtor." In this case, however, the Debtor has been anything but diligent in its management practices, and the recent indictment of its principal on six felony fraud counts raises serious questions concerning its honesty. Consequently, in this case, the principle of giving primacy to the plan of an honest and diligent debtor does not conflict with the Court's conclusion that the expeditious and economical resolution of this case is best achieved by putting the Debtor's plan on hold while Romspen's plan moves forward.

## II. Permitting Romspen's Plan to Proceed to Confirmation While Holding the Debtor's Plan in Abeyance Will Best Promote the Expeditious and Economical Resolution of This Case

In the circumstances of this case, the Court finds that it is appropriate to permit Romspen to proceed to a hearing on confirmation of its plan, while holding the Debtor's plan in abeyance.

### A. Romspen's Plan Appears to be Readily Confirmable

Romspen proposes a simple liquidating plan, which appears to be readily confirmable. As noted, Romspen's plan provides for the appointment of a plan administrator to oversee the marketing and sale of the Property. The plan classifies claims and interests into four categories: allowed priority claims, Romspen's secured claim, general unsecured creditors, and equity interests. It provides for all allowed claims to be paid in full on or before the effective date out of two funding sources: (i) an allocated cash reserve, consisting of the $339,000 in cash currently held by the Debtor, and (ii) the net proceeds of the

9

sale of the Property. Any monies remaining after all creditors are paid in full will be distributed to the Debtor's equity holder.

Because Romspen's plan pays all creditor classes in full by the effective date and provides for the distribution of any remaining monies to the equity holder, no class is impaired. Consequently, Romspen will not need to solicit any acceptances of its plan. *See* 11 U.S.C. § 1126(f). In addition, while it would be premature to rule now on whether Romspen's plan satisfies the Bankruptcy Code's various confirmation requirements, the parties have not identified any problems that are likely to defeat Romspen's ability to confirm its plan, nor is the Court aware of any such problems.

For example, there is no apparent reason why Romspen's plan will not be feasible. One of the conditions to effectiveness is that Equity Funding's claim is disallowed or withdrawn; as discussed in section II.B below, the record now before the Court suggests that Equity Funding's claim lacks merit and will be disallowed. Assuming Equity Funding's claim is disallowed, the Debtor appears to have more than enough cash to pay all creditors in full out of its cash on hand, even if the outcome of the sale process is that Romspen acquires the Property by credit-bidding the amount of its claim. While Romspen does retain certain walkaway rights in the event it is the winning bidder through a credit bid, nothing in the record suggests that Romspen is likely to exercise those rights.

For these reasons, the prospects that Romspen's plan will be both confirmed and consummated appear to be strong. Moreover, Romspen's disclosure statement is comprehensive, informative and accurate; indeed, the Debtor has filed a letter indicating it does not object to the adequacy of Romspen's disclosure statement. The Court will therefore approve Romspen's disclosure statement, which contains adequate information as defined in section 1125(a)(1). *See* 11 U.S.C. § 1125.[2]

---

[2] The Court notes that it would have waived the requirement of a disclosure statement for Romspen's plan had Romspen asked it to do so. A disclosure statement is not required for Romspen's plan, because no classes are entitled to vote on that plan. *See In re Global Fertility & Genetics, New York, LLC*, 663 B.R. 584, 599–600 (Bankr. S.D.N.Y. 2024) (holding that no disclosure statement was required for plan under which all classes either were unimpaired and deemed to accept under § 1126(f) or

10

    **B.    Confirmation of the Debtor's Plan Appears Highly Uncertain and, at Minimum, Would Require Extensive Litigation**

In contrast to Romspen's plan, the Debtor's plan is problematic in multiple respects.

    **(i)    The Debtor's plan appears unlikely to satisfy the requirement of an impaired accepting class under section 1129(a)(10)**

One of the bedrock requirements for confirmation of a chapter 11 plan is that, if any creditor class is impaired, the plan must be accepted by at least one impaired creditor class, without counting the votes of insiders. *See* 11 U.S.C. § 1129(a)(10). Because the Debtor's plan impairs Class 2—the secured creditor class, which consists of Romspen alone—and Romspen has said it will vote to reject the Debtor's plan, the plan cannot be confirmed without the acceptance of another impaired creditor class. Based on the record currently before the Court, it appears unlikely that the Debtor's plan will obtain such acceptance.

The Debtor hopes to obtain the acceptance of Class 3, the plan's general unsecured creditor class, which consists of Equity Funding and the two law firms that claim to be owed legal fees.[3] However, if Equity Funding's claim is disallowed, Class 3 will not be impaired. Without Equity Funding, that class would consist only of the two law firm claimants, whose claims would be paid in full and in cash by the effective date. While full payment in cash by the effective date does not always constitute unimpairment, *see* 11 U.S.C. § 1124(1) (a class is unimpaired if the plan "leaves unaltered the legal, equitable, and contractual rights" of each claim in the class), Debtor's counsel conceded at the February 12 hearing that Class 3 would be unimpaired if Equity Funding's claim were disallowed.[4]

---

received nothing and were deemed to reject under § 1126(g)); *accord In re Amster Yard Assocs.*, 214 B.R. 122, 124 n. 5 (Bankr. S.D.N.Y. 1997).

[3] The Debtor's plan mentions just one of the two law firms, Meltzer Lippe, whose $50,000 claim is undisputed. However, another law firm, Cadigan, has filed a claim for almost $9,000. If its claim is allowed, the Cadigan law firm will also be a member of Class 3.

[4] If Equity Funding's claim were allowed, then Class 3 might be impaired, because the Debtor's plan provides for payment of that claim to be deferred until a sale, refinancing or other major transaction occurs. However, if Equity Funding has agreed to accept this treatment, then its claim—and Class 3 as a whole—may be unimpaired. *See In re Spirit Airlines*, 668 B.R. 689, 701-02 (Bankr. S.D.N.Y. 2025) (a creditor's consent to receive less than its full legal and equitable rights does not constitute impairment).

11

Although Romspen's objection to Equity Funding's claim is not yet before the Court (it is scheduled to be heard next month), the evidence now in the record suggests that Equity Funding's claim is likely to be disallowed in its entirety. As noted, the documents attached to Equity Funding's proof of claim indicate that Equity Funding did not advance any funds to the Debtor; instead, it advanced $18 million to a non-debtor entity, Desert Willow Pref Eq LLC, which is jointly owned by Equity Funding and the Debtor's sole member. At the February 12 hearing, Debtor's counsel was unable to explain how this transaction could give rise to any claim by Equity Funding against the Debtor.

Instead, Debtor's counsel advanced a new argument, contending for the first time that the Debtor's plan can be confirmed *without* an impaired accepting class, because it supposedly renders all classes unimpaired. This last-ditch argument lacks merit. It is clear that the this plan's treatment of Romspen—the sole creditor in Class 2—renders it impaired.

As previously noted, the Debtor's plan proposes to restructure Romspen's claim by paying it over a ten-year period at a 6.99% rate of interest. This modifies both the term of Romspen's loan (it matured in 2023) and its contractual interest rate (11.25% before default, 18% after default). Clearly this treatment does not "leave[] unaltered [Romspen's] legal, equitable, and contractual rights," as section 1124(1) requires. *See* 11 U.S.C. § 1124(1). Nor does it satisfy the requirements of section 1124(2), which permits reinstatement of defaulted and accelerated debt if, among other things, the plan "reinstates the maturity of such claim or interest as such maturity existed before such default" and, subject to certain exceptions not applicable here, "does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest." *See* 11 U.S.C. § 1124(2). *See*, *e.g.*, *In re*

---

It bears note that, if Equity Funding has *not* agreed to accept this treatment, then the disparate treatment of creditors in Class 3 may pose a bar to confirmation of the Debtor's plan. In that event, the less favorable treatment Equity Funding would receive, compared to that of the two law firm claimants, would seem to violate section 1123(a)(4), which requires that all claims in any given class receive the same treatment unless the less-well-treated claimant consents. *See* 11 U.S.C. § 1123(a)(4).

12

*Liberty Warehouse Assocs. Ltd. P'ship*, 220 B.R. 546, 550 (Bankr. S.D.N.Y. 1998) (a debtor cannot "cure" a default pursuant to section 1124(2) when the loan matured pre-petition).

Despite the obvious inapplicability of section 1124, the Debtor argues that its position on this issue is supported by *In re DePietto*, 2021 WL 3287416 (S.D.N.Y. 2021). In that case, the District Court affirmed Judge Drain's decision confirming a plan that, among other things, reinstated defaulted debt pursuant to section 1124(2). However, the treatment of the reinstated debt in *DePietto* is entirely different from the Debtor's treatment of Romspen's claim. The plan in *DePietto* proposed to (i) cure the debtor's payment defaults by paying all arrears on the effective date, and (ii) reinstate the loan according to its original contractual terms, including its original maturity date and its contractual interest rate. *See DePietto*, at *3, 7-9. Here, in stark contrast, the Debtor's plan extends the original maturity date of Romspen's loan by more than ten years and cuts its interest rate almost in half.

The upshot is that, if Equity Funding's claim is disallowed—which appears likely—the Debtor's plan will be unconfirmable on its face.

### (ii) It is far from clear that the reorganized Debtor's proposed management will satisfy the requirements of section 1129(a)(5)

Section 1129(a)(5) requires not only that the identity of a debtor's proposed post-confirmation directors and officers be disclosed, but also that their service be consistent with the interests of creditors and with public policy. *See* 11 U.S.C. § 1129(a)(5)(A)(i)-(ii).

It is far from clear that the Debtor's plan, which effectively leaves Mr. Ebrahimzadeh in place as the Debtor's sole manager,[5] will satisfy these requirements. Romspen has raised serious questions about the adequacy of Mr. Ebrahimzadeh's management of the Debtor both before and after its bankruptcy filing. Two years before the bankruptcy, Romspen moved in state court for the appointment of a receiver, contending that the Debtor had failed to pay utility bills or otherwise properly maintain the Property and

---

[5] Mr. Ebrahimzadeh is the sole managing member of Corniche Sry, which is the Debtor's sole managing member.

13

had lost a substantial number of the Property's tenants as a result. The state court granted the motion, finding that the appointment of a receiver was "necessary to manage and operate the Property, to preserve and protect the collateral, and to prevent waste."

During this bankruptcy, with Mr. Ebrahimzadeh back in control, the Debtor's compliance with its obligations as a chapter 11 debtor-in-possession has been irregular at best. For example, the Debtor has repeatedly failed to file timely monthly operating reports or to provide budget variance reports to Romspen as required by the agreed interim cash collateral orders. The Debtor also has repeatedly failed to respond in timely fashion to the U.S. Trustee's requests for information—so much so that, at the February 12 hearing, counsel for the U.S. Trustee said her office intended to move to dismiss the bankruptcy if the Debtor did not immediately provide evidence that its banking arrangements are proper. (At the Court's direction, the Debtor did then provide sufficient evidence to satisfy the U.S. Trustee's concerns, but its prior delays in doing so are troubling.) Finally, the Debtor waited until seven months after the petition date to seek approval of a disclosure statement for its plan, and the plan for which it now seeks approval suffers from major deficiencies.

If this were not enough, the recent indictment of Mr. Ebrahimzadeh on six felony counts raises additional serious questions about his suitability to manage the reorganized Debtor. An indictment is not a conviction, and the Court draws no conclusions as to the ultimate merits of the criminal case. However, the pending criminal charges are sure to raise questions in the minds of tenants, suppliers or potential lenders and may impair the reorganized Debtor's ability to do business with these parties. Moreover, at any hearing on confirmation of the Debtor's plan, Mr. Ebrahimzadeh would surely be asked about these criminal charges, and if he were to invoke the Fifth Amendment privilege against self-incrimination and decline to answer on that ground, it would be proper for the Court to draw an adverse inference. This, by itself, could prove fatal to the Debtor's ability to satisfy section 1129(a)(5).

14

At the February hearing, Debtor's counsel represented that, to address the concerns raised by the indictment, Mr. Ebrahimzadeh is in the process of transferring his interest in Corniche Capital, his principal holding company, to a trust. However, in addition to presenting no evidence of this transfer, counsel was unable to answer a number of fundamental questions. In the first place, the Debtor is owned by a different holding company—Corniche Sry—and it is unclear whether Corniche Capital has any direct or indirect ownership of or control over Corniche Sry. It is also unclear who will control the new trust and whether that person will be genuinely independent of Mr. Ebrahimzadeh. The current status of the trust's formation is also unknown. Counsel could not answer the Court's questions on any of these important issues.

For all of these reasons, the Court has grave doubts as to whether the Debtor will be able to satisfy section 1129(a)(5)'s requirement that the debtor's proposed post-confirmation management would be consistent with the interests of creditors and with public policy

### (iii) A hearing on confirmation of the Debtor's plan is likely to be protracted and expensive, with little assurance that the plan will be confirmed

Even if the Debtor could somehow overcome the serious obstacles to confirmation just discussed, a hearing on confirmation of its plan would, at minimum, be protracted and expensive. An extensive evidentiary hearing would be needed not only on the issues already noted, but also on additional confirmation issues, including the feasibility of the Debtor's plan and the appropriateness of the interest rate and other terms of the note the Debtor proposes to give Romspen to cram down its secured claim. Issues of this sort are inherently fact-intensive, and their resolution here would be further complicated by Mr. Ebrahimzadeh's indictment, which raises questions about the reorganized Debtor's viability as a continuing business.

**CONCLUSION**

For these reasons, this Court finds that it is appropriate to hold the Debtor's plan in abeyance while Romspen's plan moves forward to a confirmation hearing. This ruling is without prejudice to the Debtor's right, if warranted by new developments, to renew its request for approval of a disclosure statement and the setting of a confirmation schedule for its current plan or a modified plan.

Dated:  February 24, 2026
       New York, New York

/s/ *Philip Bentley*
Honorable Philip Bentley
United States Bankruptcy Judge