**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
                                        )

In re:                               )          Chapter 11
                                          )

        1300 Desert Willow Road, LLC,     )          Case No. 25-11375 (PB)
                                          )

                      Debtor.        )          **FOR PUBLICATION**
------------------------------------------------------------------x

## BENCH DECISION ON DEBTOR'S OBJECTION TO ROMSPEN'S SECURED CLAIM[1]

**APPEARANCES**:

BRONSON LAW OFFICES, P.C.
*Counsel for the Debtor*
480 Mamaroneck Avenue
Harrison, NY 10528-0023
By: H. Bruce Bronson, Jr.

BRYAN CAVE LEIGHTON PAISNER LLP
*Counsel for Romspen Investment, LP*
301 S. College Street, Suite 2150
Charlotte, NC 28202
By: Jarret P. Hitchings
    Katie Spewak

**Hon. Philip Bentley**
**U.S. Bankruptcy Judge**

---

[1] This decision was initially dictated on the record of the April 27, 2026 hearing in this case. The Court has edited the transcript of that bench ruling to improve its readability and structure, to add a number of additional legal citations, and to reflect the Debtor's subsequent withdrawal of certain of its objections to Romspen's claim. In addition, the Court has expanded its discussion of a significant unsettled legal issue: whether the requirement of Bankruptcy Code § 506(b) that fees, costs and other charges allowed to oversecured creditors be "reasonable" applies to prepetition, as well as postpetition, charges.

Given this decision's origins as a bench ruling, it has a more conversational tone than a memorandum decision.

## INTRODUCTION

We are here on the Debtor's objection to the secured claim of its lender, Romspen Investment LP ("Romspen"). The Debtor has objected to Romspen's claim on a number of grounds. Specifically, the Debtor challenges the inclusion of default interest, late fees and forbearance fees, and it argues that interest should be computed on a simple, rather than compound, basis.[2]

The charges to which the Debtor objects accrued both prepetition and postpetition. It is undisputed that the postpetition amounts are subject to Bankruptcy Code § 506(b)'s requirement that fees allowed to an oversecured lender be reasonable. However, the case law is divided as to whether prepetition amounts are also subject to that reasonableness requirement or instead are governed by state law (in this case, New York law), which generally does not authorize courts to review parties' agreements for reasonableness. I find that the text of section 506(b), when read in conjunction with section 502(b), is ambiguous, and that several considerations compel a narrow construction of section 506(b), limiting its reasonableness standard to postpetition amounts.

Applying New York law to prepetition amounts and section 506(b) to postpetition amounts, I will (i) disallow Romspen's claim for both prepetition and postpetition late fees, (ii) allow Romspen's claim for prepetition forbearance fees, and (iii) allow Romspen's claim for postpetition default interest. (The Debtor does not object to Romspen's claim for prepetition default interest.) In addition, I find that Romspen's loan documents provide for interest to be computed on a simple, rather than compound, basis.

---

[2] The Debtor had previously objected to Romspen's attorneys' fees and to the accuracy of Romspen's claim calculations. After the April 27 hearing, the Debtor withdrew those portions of its claim objection.

2

For purposes of this decision, I assume that Romspen is oversecured, as the appraisals filed by the parties during this case indicate. However, the Debtor's sole property is currently being marketed for sale, and a sale hearing is scheduled to be heard in September. In these circumstances, it would not be appropriate for me to rule now on whether Romspen is oversecured. Instead, that issue will be determined by the outcome of the sale. That is, Romspen will be entitled to postpetition interest to the extent, but only to the extent, the sale proceeds cause it to be oversecured.

### FACTUAL AND PROCEDURAL BACKGROUND

My ruling assumes familiarity with the facts of this case, which I set forth in some detail in my recent decision, *In re 1300 Desert Willow Rd., LLC*, 677 B.R. 176 (Bankr. S.D.N.Y. 2026). For today's ruling, I will briefly summarize the facts most directly relevant to the issues before me.

The Debtor is a single-asset real estate entity, which was formed to acquire a light industrial manufacturing facility located in Los Lunas, New Mexico. In April 2022, the Debtor refinanced its debt by taking out a $20 million loan, secured by a first mortgage on that property, from Romspen, a real estate investment firm. Later that year, after a number of tenants vacated the property, the Debtor failed to make payments due under the loan, and the loan became fully due and payable. Romspen scheduled the property for a foreclosure sale but then entered into a series of forbearance agreements with the Debtor, which remained in place for a bit more than two years. In June 2025, after the last forbearance agreement had lapsed and with a foreclosure sale finally imminent, the Debtor filed its chapter 11 petition.

Romspen is the Debtor's only secured creditor, and its only substantial creditor of any sort. It asserts a claim of approximately $26 million as of the petition date, consisting of about $20

million of principal and $6 million in interest and other charges. The only general unsecured claims that have been filed and not disallowed are the claims of two law firms that had represented the Debtor prepetition; their claims total a bit less than $60,000. Administrative and priority claims are not expected to be substantial. As a result, Romspen holds the vast majority of the claims against the Debtor, and there is a very good chance that, if Romspen turns out to be oversecured, the Debtor will be solvent.

I confirmed Romspen's liquidating plan for the Debtor on March 31, 2026. Prior to confirming that plan, I had ruled that the Debtor's plan was not likely to be confirmable, and for that and other reasons, I allowed Romspen to proceed to confirmation with its plan while putting the Debtor's plan on hold. *See 1300 Desert Willow*, 677 B.R. at 183–87. In connection with my order confirming Romspen's plan, I approved bidding procedures for the sale of the Debtor's property, with a bid deadline of August 10, 2026 and a sale hearing to follow.

Let me turn now to the record with respect to the claim objection on which I'm ruling today. The Debtor filed a claim objection and later a reply. Romspen filed a single response. The Debtor filed one declaration and Romspen filed two declarations in connection with their respective pleadings. Romspen also filed a supplemental appendix attaching certain Canadian legal authorities.

On April 23, 2026, I held a non-evidentiary hearing, pursuant to Local Bankruptcy Rule 9014-2, at which counsel for Romspen and the Debtor appeared. As I usually do at such hearings, I asked the parties whether they wished to present any evidence beyond what they had already filed in connection with their motion papers. Both parties told me essentially the same thing— namely, that they did not wish to present any further evidence and did not believe an evidentiary hearing was needed, provided they could resolve their disputes over the reasonableness of

Romspen's attorney's fees and the arithmetical accuracy of its claim calculations. The parties have since resolved those issues, and the Debtor has withdrawn its objections on those two points.

**GOVERNING LEGAL STANDARDS**

Before turning to the Debtor's specific objections to Romspen's claim, I will address several threshold legal topics: (i) the Bankruptcy Code standards governing the allowance of fees, costs and other charges that accrue in favor of an oversecured creditor; (ii) the relevant standards under New York law; and (iii) the burden of proof for claim objections under the Bankruptcy Code.

**I.     The Treatment of Oversecured Creditors' Claims Under Bankruptcy Code §§ 506(b) and 502(b)**

The Bankruptcy Code treats claims that arise prepetition differently than claims that arise postpetition. Section 502(b) provides that a claim is determined "as of the date of the filing of the petition." 11 U.S.C. § 502(b). As a result, postpetition interest and other postpetition charges are generally excluded from the claim and not allowed. *See, e.g.*, *Pension Ben. Guar. Corp. v. Oneida Ltd.*, 562 F.3d 154, 157 (2d Cir. 2009) ("[T]he existence of a valid bankruptcy claim depends on (1) whether the claimant possessed a right to payment, and (2) whether that right arose before the filing of the petition." (internal quotation marks and citation omitted)). In addition, absent a specific Bankruptcy Code provision to the contrary, *see, e.g.*, 11 U.S.C. §§ 502(b)(1)-(9), 502(c)-(k), the allowability of the claim is determined by nonbankruptcy law. *See* 11 U.S.C. § 502(b)(1) (a court shall allow a claim "except to the extent that—(1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law"); *see also Pension Ben. Guar. Corp.*, 562 F.3d at 157 ("To make these [claim allowance] determinations, we look to the substantive nonbankruptcy law that gives rise to the debtor's obligation.").

5

The rule that claims are fixed as of the petition date is subject to certain limited exceptions, one of which—the one relevant here—is contained in section 506(b). That section permits an oversecured creditor to recover "interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose." 11 U.S.C. § 506(b). It is settled that this provision allows an oversecured creditor to recover postpetition interest, plus any reasonable postpetition fees or other charges, to the extent the value of the creditor's collateral covers those amounts. *See, e.g.*, *In re Rosado*, 2025 WL 1520515, at *6 (Bankr. S.D.N.Y. 2025). Whether this provision has any effect on the *prepetition* portions of an oversecured creditor's claim is the issue now before the Court. Specifically, does section 506(b)'s reference to "reasonable fees, costs, or charges" impose a reasonableness limitation on the creditor's prepetition fees and other charges, or does it merely limit the postpetition charges the creditor can recover?

I am unaware of any decisions in this district that have squarely addressed this issue.[3] In other jurisdictions, the case law is divided. Two courts of appeal—for the Fifth and Eleventh Circuits—have each ruled that the text of section 506(b) unambiguously requires the application of that section's reasonableness standard to prepetition, as well as postpetition, charges. *See In re Welzel*, 275 F.3d 1308, 1314 (11th Cir. 2001) (*en banc*) ("Section 506(b) . . . does not draw a distinction between fees vested pre- or post-petition . . . . Instead, the subsection refers blanketly to 'reasonable fees,' without differentiation based on the time the fees vested."); *see also Wells Fargo Bank, N.A. v. 804 Congress L.L.C. (In re 804 Congress, L.L.C.)*, 756 F.3d 368, 374–75 (5th

---

[3] Two decisions in this district have applied section 506(b)'s reasonableness standard to prepetition fees. See *In re 243rd St. Bronx R&R, LLC*, 2013 WL 1187859, at *2 (Bankr. S.D.N.Y. 2013); *In re Vest Assocs.*, 217 B.R. 696, 700 (Bankr. S.D.N.Y. 1998). However, neither decision explains its basis for doing so, and it appears that the application of that standard to prepetition fees may not have been disputed in either case.

Cir. 2014) (following *Welzel* on this issue). Notably, neither of these decisions makes any mention of the tension between their reading of section 506(b) and the text of section 502(b), which allows prepetition charges to the full extent provided by state law.

Outside the Fifth and Eleventh Circuits, a number of lower courts have disagreed with those two courts of appeal. According to a 2011 New Jersey bankruptcy court decision:

> The majority rule is that the allowability of pre-petition interest, fees, costs, and penalties "as part of the secured creditor's 'claim' is not determined by section 506, but is governed by section 502 in conjunction with other provisions of the Code." *See* 4 COLLIER ON BANKRUPTCY ¶ 506.04[1] (Alan N. Resnick and Henry J. Sommer eds., 16th ed.)

*In re Wesley*, 455 B.R. 383, 386 (Bankr. D.N.J. 2011) (collecting authorities); *see also, e.g.*, *In re Nunez*, 317 B.R. 666, 670 (Bankr. E.D. Pa. 2004) ("Quite simply, interest, fees and costs arising pre-petition are already a part of a secured creditor's proof of claim in the first instance rendering section 506(b) inapplicable."); *In re Vanderveer Ests. Holdings, Inc.*, 283 B.R. 122, 131 (Bankr. E.D.N.Y. 2002) ("Interest, fees, costs and charges arising pre-petition are part of the secured creditor's claim in the first instance, and are therefore not governed by § 506(b).").

The text of section 506(b) does not provide a clear answer to this issue. When that section is read in the context of related Bankruptcy Code sections—section 502(b) in particular—the conclusion that section 506(b) is ambiguous is inescapable. *See Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238, 250 (2d Cir. 2013) ("In determining whether statutory language is ambiguous, we reference the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." (internal quotation marks and citation omitted)); *see also Gonzales v. Carhart*, 550 U.S. 124, 152 (2007) (courts must "use the ordinary meaning of [statutory] terms unless context requires a different result"). On the one hand, section 506(b)'s reasonableness requirement on its face applies to all fees, costs and charges

provided for by agreement or statute, without any temporal limitation. On the other hand, as courts have observed, *see, e.g.*, *In re Wesley*, 455 B.R. at 386, a broad reading of this provision, so as to impose a reasonableness limitation on prepetition as well as postpetition charges, conflicts with section 502(b)'s allowance of prepetition charges to the full extent provided by nonbankruptcy law.

Two considerations compel adoption of the narrower construction of section 506(b)'s reasonableness requirement that courts outside the Fifth and Eleventh Circuits have adopted. First, this interpretation harmonizes that section with section 502(b) in a manner consistent with the text of both sections. *See Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 144 (2d Cir. 2002) ("[T]he preferred meaning of a statutory provision is one that is consonant with the rest of the statute.") (Katzmann, C.J.). Section 502(b) can only be read one way: It unambiguously provides for the allowance of all prepetition claims recoverable under nonbankruptcy law, regardless of whether the bankruptcy court might consider the claim unreasonable. In contrast, section 506(b)'s reasonableness requirement can plausibly be read either broadly or narrowly—that is, either to apply to all claims, prepetition as well as postpetition, or to apply only to the specific postpetition sums that section 506(b) adds to the creditor's section 502(b) claim. The narrower of these two interpretations is preferable, because unlike the broader interpretation, it is consistent with the plain meaning of section 502(b).

A second, equally compelling reason to reject a broad construction of section 506(b) is that that interpretation produces an absurd result: It treats oversecured creditors less favorably than undersecured creditors with respect to their prepetition claims. Specifically, this interpretation deprives oversecured creditors—but not undersecured creditors—of any portion of their

8

prepetition claim that the bankruptcy court finds to be unreasonable. As a result, an oversecured creditor could get a lower recovery than an undersecured creditor with an identical claim.

To take an extreme example, imagine two secured creditors with identical claims for $1 million, one of which is slightly oversecured (its collateral is worth $1,001,000), the other of which is slightly undersecured (its collateral is worth $999,000). Imagine further that a substantial prepetition portion of each creditor's claim—say $100,000—is allowable under state law but would be deemed unreasonable by the bankruptcy court. Under the interpretation of section 506(b) adopted by the two courts of appeal, the undersecured creditor would receive an allowed secured claim of $999,000 (the value of its collateral), but the oversecured creditor would get an allowed secured claim of only $900,000—a topsy-turvy result.

It could be argued that bankruptcy policy disfavors the payment of unreasonably large fees to oversecured creditors, particularly when unsecured creditors are being paid only pennies on the dollar. This is a legitimate and important concern. However, the imposition of a reasonableness requirement on the prepetition fees of oversecured, but not undersecured, creditors is not a coherent or a textually supported solution to this issue. The only conclusion that makes sense and is consistent with the Bankruptcy Code's text is that Congress chose not to impose a reasonableness requirement on the prepetition claims of any secured creditors, whether oversecured or undersecured.[4]

---

[4] In this respect, the Code's treatment of secured claims mirrors its treatment of general unsecured claims, which similarly are not subject to a general reasonableness requirement. As already noted, such claims are generally allowed to the full extent provided by nonbankruptcy law, *see* 11 U.S.C. § 502(b)(1), absent a specific Bankruptcy Code provision to the contrary, *see, e.g.*, 11 U.S.C. §§ 502(b)(1)-(9), 502(c)-(k). Only a small number of these Bankruptcy Code exceptions impose a reasonableness requirement. *See, e.g.*, 11 U.S.C. § 502(b)(4) ("[A] claim . . . for services of an insider or attorney of the debtor [may not] exceed[] the reasonable value of such services.").

For these reasons, I conclude that section 506(b)'s reasonableness requirement applies only to postpetition fees and other charges. Charges that accrue prepetition in favor of an oversecured creditor are allowed to the full extent provided by nonbankruptcy law.

## II.    New York Law Concerning the Enforcement of Contractual Agreements

This brings me to the second threshold legal topic: the legal standards governing the enforcement of parties' agreements under New York law.[5] As the New York Court of Appeals has held, "it is a deeply rooted principle of New York contract law that parties may contract as they wish . . . in the absence of some violation of law or transgression of a strong public policy." *2138747 Ontario, Inc. v. Samsung C&T Corp.*, 31 N.Y.3d 372, 377 (N.Y. 2018) (internal quotation marks and citations omitted); *see also 159 MP Corp. v. Redbridge Bedford, LLC*, 33 N.Y.3d 353, 359–60 (N.Y. 2019) (citing *New England Mut. Life Ins. Co. v. Caruso*, 73 N.Y.2d 74, 81 (N.Y. 1989)).

Consistent with this principle, New York courts generally enforce contractual agreements according to their terms, particularly when the contract is the product of arms' length negotiations between sophisticated parties, as was the case here. *See Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 695 (N.Y. 1995) ("Freedom of contract prevails in an arm's length transaction between sophisticated parties . . . and in the absence of countervailing public policy concerns there is no reason to relieve them of the consequences of their bargain."); *see also 159 MP Corp. v. Redbridge Bedford, LLC*, 33 N.Y.3d 353, 359-60 (N.Y. 2019) (public policy requires "disfavoring judicial upending of the balance struck at the conclusion of the parties' negotiations"

---

[5] Romspen's note is governed by New York law.

as that "promotes certainty and predictability and respects the autonomy of commercial parties in ordering their own business arrangements").

This general rule is subject to a limited number of exceptions. The Debtor has argued that two of those exceptions apply here: New York's prohibition on usurious contracts, and its rule that liquidated damages provisions that operate as penalties will not be enforced.

New York's usury rules are set forth in two statutes, the General Obligations Law and the Penal Law. *See* N.Y. GEN. OBLIG. LAW § 5-521(1); N.Y. PENAL LAW § 190.40. Under these statutes, loans of less than $2.5 million to a business are deemed usurious if they exceed the 25 percent criminal usury rate. *See* N.Y. PENAL LAW § 190.40; *see also Alleon Cap. Partners, LLC v. Choudhry*, 225 A.D.3d 578, 580 (2d Dep't 2024) ("[T]he defense of usury is not available to corporations, but this bar does not preclude a corporate borrower from raising the defense of 'criminal usury' (*i.e.*, interest over 25%) in a civil action." (citing *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320 (N.Y. 2021)).

In contrast, loans above $2.5 million to a business are not subject to any usury restrictions. *See Alleon Cap. Partners*, 225 A.D.3d at 580 ("[C]ivil and criminal usury laws do not apply to any loan or forbearance in the amount of [$2,500,000] or more." (internal quotation marks and citation omitted)). This appears to reflect a legislative judgment that large commercial transactions generally involve sophisticated parties, which do not need the same degree of protection as do borrowers that take out smaller loans. *See Adar Bays*, 37 N.Y.3d at 331 (N.Y. 2021) ("The legislative history of the 1980 amendment . . . evidences the legislature's judgment that borrowers of more than $2.5 million were capable of protecting their own interests without the protection of the usury laws." (internal quotation marks and citation omitted)). The loan to this Debtor was in

11

the amount of approximately $20 million, far above the usury cap, so it is clear that New York's usury laws do not apply.

As for liquidated damages provisions, New York law provides that such provisions are enforced unless found to function as an impermissible penalty. In the seminal case on this issue, *Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420 (N.Y. 1977), the Court of Appeals ruled that "[p]arties to a contract have the right to agree to [liquidated damages] clauses provided that the clause is neither unconscionable nor contrary to public policy . . . and public policy is firmly set against the imposition of penalties or forfeitures." *Truck Rent-A-Ctr.*, 41 N.Y.2d at 424 (*citing Mosler Safe Co. v. Maiden Lane Safe Deposit Co.*, 199 N.Y. 479, 485 (N.Y. 1910) and *City of Rye v. Pub. Serv. Mut. Ins. Co.*, 34 N.Y.2d 470, 472–73 (N.Y. 1974)).

## III.    The Burden of Proof for Claim Objections

The burden of proof for claim objections requires only brief discussion, as these legal standards are well-known and not disputed by the parties.

Section 502(a) of the Bankruptcy Code provides that a filed proof of claim is "deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). It is settled that claim objections are subject to a "shifting burden of proof." *In re Genco Shipping & Trading Ltd.*, 2015 WL 2444152, at *2 (Bankr. S.D.N.Y. 2015). A claim is *prima facie* valid if properly filed. *See* Fed. R. Bankr. P. 3001(f); *see also In re Reilly*, 245 B.R. 768, 773 (B.A.P. 2d Cir. 2000), aff'd, 242 F.3d 367 (2d Cir. 2000); *In re Genco*, 2015 WL 2444152, at *2. To overcome that *prima facie* effect, the objecting party must come forward with evidence that, if credited, would refute at least one of the allegations essential to the claim. *See In re Reilly*, 245 B.R. at 773.

If the objector does so by producing evidence at least equal in force to the *prima facie* case, the presumption of validity is overcome, and the burden shifts back to the claimant. At that point, the claimant must prove, by a preponderance of the evidence, that the claim is allowable under applicable law. *See Creamer v. Motors Liquidation Co. GUC Trust (In re Motors Liquidation Co.)*, 2013 WL 5549643, at *3 (S.D.N.Y. 2013); *see also In re Genco*, 2015 WL 2444152, at *2.

### THE DEBTOR'S OBJECTIONS TO ROMSPEN'S CLAIM

Turning now to the specifics of the Debtor's claim objection, I will address first the Debtor's objections to claim amounts that accrued between July 21, 2023 and the petition date; then its objections to amounts that accrued after the petition date; and finally, the issue of compound versus simple interest.

### I.   Romspen's Prepetition Claim Amounts

The Debtor has objected to all of Romspen's prepetition late fees and forbearance fees.[6] However, by agreement dated July 21, 2023 (the second forbearance agreement), the Debtor and Romspen agreed on the amounts that the Debtor owed Romspen as of that date, including the specific amounts of late fees and forbearance fees that had accrued. The Debtor has not challenged the enforceability of that agreement. Consequently, I will treat the amounts of late fees and forbearance fees owed as of July 21, 2023 as fixed by that agreement, and I will consider only the Debtor's objections to fees that accrued after that date.

For the reasons I will now explain, I am going to disallow Romspen's claim for late fees that accrued between July 21, 2023 and the petition date, and to allow its claim for forbearance

---

[6] The Debtor initially objected to Romspen's claim for prepetition default interest as well, but at the April 27, 2026 hearing, the Debtor withdrew that objection.

fees that accrued during that period. In addition, I will allow all sums to which the parties stipulated in the second forbearance agreement.

### A.  Late fees

The note provides for two different types of late fees. One is a 5 percent charge for each late payment. According to Romspen, those amounts totaled approximately $338,000 as of the petition date. A portion of that $338,000 amount, namely about $106,000, was fixed by the July 21, 2023 forbearance agreement; my ruling will address only the portion of these fees that accrued after that. The second type of late fee is a lump sum late fee that accrues upon maturity or acceleration of the note. That late fee is calculated as 0.5 percent of the principal balance of $20.1 million, or $100,500. That $100,500 sum was assessed prior to July 21, 2023 and is included in Schedule 1 to the second forbearance agreement. In other words, that is one of the amounts to which the Debtor agreed when it entered into that forbearance agreement. I will therefore deny the objection to the extent it seeks to challenge that amount.

The Debtor argues that the prepetition late fees constitute an unenforceable penalty under New York law. I agree. The New York Court of Appeals held, in its *Truck* decision, that contractual payments that constitute penalties are unenforceable. *See Truck Rent-A-Ctr.*, 41 N.Y.2d at 424 ("[P]ublic policy is firmly set against the imposition of penalties or forfeitures for which there is no statutory authority."). Although the *Truck* case involved liquidated damages, not late fees, the standard adopted by the Court of Appeals in that case appears to apply more broadly. That is, the court in *Truck* didn't limit its analysis to liquidated damages.

New York courts that have addressed late fees have applied a similar standard. They have stricken late fees when they found them to compensate the lender for the same costs as default interest and therefore to function as penalties. *See, e.g., Beltway 7 Props., Ltd. v. Blackrock Realty*

14

*Advisers, Inc.*, 167 A.D.3d 100, 106–7 (1st Dep't 2018) (applying liquidated damages doctrine to late charges and finding that further factual development was required to determine whether the late charge was an unenforceable penalty).

However, the New York courts don't appear to apply this test on an across-the-board basis. That is, they don't appear to rule that late fees always duplicate default interest. Rather, they appear to apply this legal standard on a case-by-case basis and to decide in each individual case whether the late fee duplicates the default interest and is therefore impermissible. *See id.*; *see also, e.g.*, *Novendstern v. Mount Kisco Med. Grp.*, 177 A.D.2d 623, 625 (2d Dep't 1991) (striking a duplicative claim for fees as an unenforceable penalty).

In this case, the only evidence the parties have presented on this issue is the language of the note. In particular, Romspen points to recitals in sections 2.1 and 2.3, which it claims support the conclusion that default interest and late fees under the note serve different purposes.

I don't agree. The purposes set forth in the note with respect to late fees and default interest are very similar. Late fees are described in section 2.1 as being to "defray the expense incurred by [Romspen] in handling and processing such delinquent payment and to compensate [Romspen] for the loss of the use of such delinquent payment." Mestrezat Decl. (ECF No. 13), Ex. 4, § 2.1. Section 2.3 of the note says that default interest is "given for the purpose of compensating [Romspen] at reasonable amounts for [its] added costs and expenses that occur as a result of [the Debtor's] default and that are difficult to predict in amount, such as increased general overhead, concentration of management resources on problem loans, and increased cost of funds." *Id*. at § 2.3.

Those strike me as roughly the same purposes. While the wording is different, the substance is essentially the same. The stated purposes of both the late fees and the default interest are to

compensate Romspen for, one, the additional administrative expense of dealing with the defaulted loan and, two, the loss of the use of the funds that the Debtor failed to pay. Because these purposes are at bottom the same, I find that the late fees incurred between July 21, 2023 and the petition date are duplicative of the default interest and therefore constitute an unenforceable penalty under New York law.

It is clear that the same result would follow if the allowability of the prepetition late fees were governed by section 506(b)'s reasonableness standard, rather than by New York law. In the first place, as a general matter, section 506(b)'s requirement that fees be reasonable is more stringent than New York's requirement that the fees not constitute a penalty, so it is to be expected that any fees that fail under the New York standard would also fail under the section 506(b) standard. More specifically, courts that have applied section 506(b) to late fees have consistently held, at least in this district, that a secured creditor is not entitled to receive both default interest and late fees because those sorts of charges duplicate each other and are therefore unreasonable. *See In re 785 Partners LLC*, 470 B.R. 126, 137 (Bankr. S.D.N.Y. 2012) ("The decisional law is uniform that oversecured creditors may receive payment of either default interest or late charges, but not both." (quoting *In re Vest Assocs.*, 217 B.R. 696, 701 (Bankr. S.D.N.Y. 1998))).

Fo these reasons, I will disallow Romspen's claim for late fees that accrued between July 21, 2023 and the petition date.

### B. Forbearance fees

As already noted, the Debtor and Romspen entered into a series of forbearance agreements in the years before the Debtor's bankruptcy filing, which collectively required Romspen to forbear for slightly more than two years, from late January 2023 to late February 2025. In connection with those agreements, Romspen charged the Debtor a number of forbearance fees. Romspen's proof

of claim stated that $100,000 of those fees remained unpaid. Romspen has since corrected that amount to say that $150,000 of those fees remain unpaid.

There were additional forbearance fees, in larger amounts, that Romspen charged and the Debtor paid. As to those fees, the Debtor is asking me to credit those in reduction of its debt to Romspen. However, a substantial majority of those fees were not real fees—that is, they were not charges incurred by the Debtor by virtue of failing to pay on time. Rather, they were agreements by the Debtor to pay down its debt to Romspen by specified amounts. For instance, the January 24, 2023 agreement provided that both the $600,000 "forbearance fee" and the $225,000 "extension fee" were to be credited to the loan balance. *See* Mestrezat Decl. (ECF No. 13), Ex. 12, §§ 5(d), 6(c). I don't consider payments of this sort to be fees. They are mandatory repayments of part of an overdue debt, not fees. The real fees totaled slightly more than $500,000, specifically $508,334, of which $150,000 remains unpaid. Those are the fees I will consider.

The Debtor has not shown that the forbearance fees violate governing New York law standards. In the first place, the total amount of forbearance fees was not enormous—only a bit more than $500,000—in exchange for which the Debtor got two years of forbearance. This sum doesn't strike me on its face as grossly disproportionate to the financial risk Romspen took on by forbearing for two years from enforcing its remedies with respect to its defaulted $20 million loan.

Of course, this is an issue of fact. What's dispositive is that the Debtor has not presented any evidence to support a finding that this sum was grossly disproportionate to the risks involved. For example, the Debtor has not offered the testimony of a financial advisor to say that the forbearance fees Romspen charged were greater than the forbearance fees that lenders generally charge—that is, that the fees were above market. I am not aware of any facts that would support

17

the conclusion that the forbearance fees Romspen charged were above market or unreasonable in any way.

I therefore find that these fees were reasonable. They would be allowable under section 506(b), and even more clearly, they are allowable under New York law. The Debtor has not identified any New York standard more stringent than 506(b)'s reasonableness test. To the contrary, the only New York standard that could potentially override the parties' loan agreement—the rule that liquidated damages that operate as penalties will be disallowed—sets a much higher bar than mere unreasonableness.

In addition, it is far from clear that this New York rule applies to forbearance fees. New York courts routinely uphold forbearance agreements. *See 3052 Brighton 1st St. II, LLC v. 3052 Brighton First, LLC*, 212 A.D.3d 695, 696 (2d Dep't 2023) ("A forbearance agreement will generally be enforced according to its terms where . . . it is unambiguous."). Moreover, forbearance agreements serve different purposes than liquidated damages provisions. "Liquidated damages are an estimate, made by the parties at the time they enter into their agreement, of the extent of the injury that would . . . result [from] breach of the agreement." *In re Helios & Matheson Analytics, Inc.*, 633 B.R. 115, 119 (Bankr. S.D.N.Y. 2021) (internal quotation marks and citations omitted).

Forbearance fees compensate lenders for something quite different. A lender that forbears agrees to refrain from exercising its contractual remedies for a specified period of time. In broad terms, forbearance agreements accomplish what the automatic stay accomplishes in bankruptcy: They require the lender to delay enforcement of its contractual remedies, thereby undertaking the risk that the value of its collateral will decline while it is barred from exercising its remedies. Forbearance fees, like adequate protection payments, compensate the lender for this risk. *Cf. In re Pine Lake Vill. Apartment Co.*, 19 B.R. 819, 825 (Bankr. S.D.N.Y. 1982) ("[A] secured creditor

18

has the right to receive adequate protection for any decline in value the collateral may suffer after the automatic stay is in effect, since but for the stay, the creditor could foreclose to prevent or mitigate any loss in the value of the security.").

Given the differences between liquidated damages provisions and forbearance agreements, it is far from clear that a New York court would apply the liquidated damages standard to forbearance fees. But even if that standard applied, it would not be satisfied here. The Debtor has not shown that the amounts of the forbearance fees were unreasonable, and it follows that those fees did not operate as unlawful penalties under New York law.

The Debtor's remaining arguments to disallow the forbearance fees can be addressed very briefly. The Debtor argues that New York's usury laws treat forbearance fees as interest. That appears to be correct, but it is not relevant because, as I've already discussed, New York's usury laws do not apply to loans in excess of $2.5 million to businesses. This loan, of course, was for much more than $2.5 million. The Debtor argued, finally, that additional factual development is needed on the reasonableness of the forbearance fees. However, the Debtor did not ask me to adjourn the hearing to allow it to take discovery on that issue, nor did the Debtor request an evidentiary hearing on the issue.

For these reasons, I will allow Romspen's claim for forbearance fees that accrued between July 21, 2023 and the petition date.

## II.     Romspen's Postpetition Claim Amounts

The Debtor objects to two sorts of postpetition charges: default interest and late fees. I will allow Romspen's claim for postpetition default interest to the extent Romspen turns out to be oversecured, and I will disallow Romspen's claim for postpetition late fees.

19

### A. Default interest

I addressed the legal standards governing postpetition default interest for oversecured creditors at some length in a decision earlier this year, *In re 33 Mako LLC*, 2026 WL 922562 (Bankr. S.D.N.Y. 2026). I incorporate that legal discussion into this ruling and will only give a short summary of the points most salient to the issue now before me.

Courts construing section 506(b) in the default interest context have "generally applied a rebuttable presumption that an oversecured creditor is entitled to postpetition interest at the contractual default rate." *Id*. at *3. Courts look first at whether the Debtor is solvent or not. *Id*. And if the Debtor is solvent, courts have treated the presumption in favor of the contract rate as "very strong, perhaps unrebuttable or close to unrebuttable." *Id*. If the Debtor is insolvent, the courts strike postpetition contractual default interest if doing so is warranted by one or more specific equitable considerations: (i) whether the contractual default rate is a penalty; (ii) whether there has been misconduct by the secured creditor; (iii) whether awarding postpetition interest at the contractual default rate would harm other creditors; and (iv) whether allowing such interest would have an adverse effect on the Debtor's fresh start. *See id*.

How this test applies in this case will depend on the Debtor's financial position following the consummation of the upcoming sale of the Debtor's property. One possible outcome is that Romspen may be undersecured, in which case it would not be entitled to any postpetition interest. Another possibility, at the other end of the spectrum, is that Romspen is oversecured and the Debtor is solvent. In that scenario, as I just mentioned, the presumption in favor of allowing interest at the contractual default rate would be very strong, maybe unrebuttable. The Debtor has not identified any possible basis to overcome that presumption.

The third possible scenario is that Romspen is oversecured but the Debtor is nonetheless insolvent. I find that, if that is the eventual scenario, the Debtor has not made a sufficient showing to overcome the presumption in favor of awarding interest at the contractual default rate.

The Debtor makes only one argument as to why default rate interest should be disallowed in this third scenario. The debtor argues that the last of the four equitable factors—whether allowing default interest would have an adverse effect on the Debtor's fresh start—warrants disallowance of default interest. If I disallow postpetition default interest, the Debtor contends, it may be able to raise sufficient funds to pay off the full amount of Romspen's claim. In that event, Romspen has said that it would allow the Debtor to keep the property, rather than going through with the scheduled sale. According to the Debtor, this would preserve its "fresh start."

This argument fails for several reasons. First, there is no evidence that the Debtor would actually be able to raise the money it needs to pay off Romspen's claim even if I disallowed default interest. According to Romspen, the Debtor has repeatedly said, both before and during the bankruptcy, that it would soon be able to put together a refinancing to take out Romspen's loan, but these promises have never come to fruition. I have no way of knowing whether the Debtor's current expectation of a refinancing is accurate or just another hope on its part that again will not come to fruition.

There is also a second, independent reason why I find this "fresh start" factor to be entitled to little or no weight. Strictly speaking, the notion of a fresh start applies only to individuals, not companies. Nevertheless, courts have sometimes given this factor weight in corporate chapter 11 cases, at least when the debtor had a real operating business, with employees and ongoing commercial operations. *See, e.g.*, *In re 53 Stanhope LLC*, 625 B.R. 573 (Bankr. S.D.N.Y. 2021).  I agree that, in cases of that sort, important bankruptcy interests may be served by allowing the

21

debtor to continue to operate its business. This case, however, is a single asset real estate case. The Debtor has no operations beyond those required to maintain and lease out its one property, and it has contracted out those limited operations to a property management company. The Debtor itself has only one employee—Mr. Ebrahimzadeh, the Debtor's principal. It is not clear that any bankruptcy interest would be served by disallowing Romspen's postpetition default interest in the hope that this would enable Mr. Ebrahimzadeh to retain the Debtor's business. Whether or not Mr. Ebrahimzadeh keeps the Debtor's property, the business will continue. The record provides no indication that any jobs would be lost, or that the property's tenants would suffer any adverse effects, if ownership of the property were to change hands.

Moreover, the particular facts of this case reinforce the absence of a bankruptcy interest in preserving Mr. Ebrahimzadeh's ownership. As I ruled in my earlier decision in this case, Mr. Ebrahimzadeh is not an ideal manager of the Debtor's property. *See 1300 Desert Willow*, 677 B.R. at 186. He had a poor track record before the bankruptcy, so poor that a receiver was appointed to displace him. When the Debtor regained possession upon filing bankruptcy, Mr. Ebrahimzadeh proceeded to do a poor job of managing the Debtor in this case. *See id.* In addition, during the bankruptcy, Mr. Ebrahimzadeh was indicted by a federal grand jury in a Massachusetts district court on six felony counts, including wire fraud and bank fraud. While I have no basis to know whether he is likely to be convicted or acquitted, his indictment is likely to impair his ability to manage the Debtor's property effectively. *Id.*

For these reasons, I find that no basis exists to disallow default interest. To the extent Romspen turns out to be oversecured, I will allow Romspen's claim for postpetition interest at the default rate.

22

### B. Late fees

The next type of postpetition charges to which the Debtor objects is late fees. I will say at the outset that it is not clear to me that any late fees actually accrued postpetition. As already discussed, the note provides for two types of late fees. One is a fee equal to 5 percent of each monthly interest payment that is late. That fee, I would assume, ceased to accrue after the loan was accelerated, which happened before the bankruptcy. The other sort of late fee under the note was a one-time fee, a fee of 0.5 percent of the total unpaid principal, which came due when Romspen accelerated the loan. That fee accrued and was paid prepetition.

To the extent some late fees may have accrued postpetition, I am going to disallow them. As previously discussed, postpetition late fees are subject to the general reasonableness standard of section 506(b). Applying that standard, bankruptcy courts in this district have adopted an across-the-board rule that late fees duplicate default interest and therefore are *per se* unreasonable if the lender is being paid postpetition default interest. *See In re 785 Partners LLC*, 470 B.R. 126, 137 (Bankr. S.D.N.Y. 2012) (quoting *In re Vest Assocs.*, 217 B.R. 696, 701 (Bankr. S.D.N.Y. 1998)). In addition, I have already found that, under the specific facts of this case, the late fees duplicate the default interest. For these reasons, I will disallow Romspen's postpetition late fees.

### III.    Simple Versus Compound Interest

The Debtor argues that Romspen is entitled only to simple interest, not compound interest. This issue is governed by the terms of the promissory note, as well as the loan agreement, which is incorporated by reference into the note.

It is well settled under New York law that, when a contractual agreement is complete and unambiguous, it should be enforced according to its terms. *See South Rd. Assocs., LLC v. Int'l Bus. Machs. Corp.*, 4 N.Y.3d 272, 277 (N.Y. 2005). Further, it is "important to read the document as a

whole to ensure that excessive emphasis is not placed upon particular words or phrases." *Id*. Whether a document is ambiguous or plain is a question of law. *Id.* at 278. A contract is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Krumme v. WestPoint Stevens Inc*., 238 F.3d 133, 139 (2d Cir. 2000) (internal quotation marks and citation omitted).

Evidence extrinsic to a contract may be considered if the contract is ambiguous. *See South Rd. Assocs.*, 4 N.Y.3d at 278; *State v. Home Indem. Co*., 66 N.Y.2d 669, 671 (N.Y. 1985). Where no party adduces extrinsic evidence, or where the extrinsic evidence provided does not resolve the ambiguity, interpretation of the contract remains a question of law. *See Hartford Acc. & Indem. Co. v. Wesolowski*, 33 N.Y.2d 169, 172 (N.Y. 1973) ("[I]f the equivocality must be resolved wholly without reference to extrinsic evidence the issue is to be determined as a question of law for the court."); *see also Home Indem.*, 66 N.Y.2d at 672 (where "no inferences [could] be drawn from extrinsic evidence, the interpretation of the insurance policy [was] an issue of law.").

## A. Relevant provisions of the note and loan agreement

I find that the relevant provisions of the note and the loan agreement support the conclusion that simple interest, not compound interest, is required.

Romspen's argument that the note requires compound interest rests on the last four words of the first sentence of section 1.2, which provides: "*Interest* at the Applicable Interest Rate *on the principal sum* of this Note shall be calculated on the basis of a three hundred sixty (360) day year and the actual number of days elapsed in such period, and *shall be compounded monthly*." Mestrezat Decl. (ECF No. 13), Ex. 4, § 1.2 (emphasis added). Romspen argues that the last four words of this sentence, providing that interest "shall be compounded monthly," are dispositive. According to Romspen, nothing in the note contradicts these four words.

24

The Debtor contends, in response, that this sentence is ambiguous, because it provides that interest is to be calculated and compounded "on the principal sum of this Note." Mestrezat Decl. (ECF No. 13), Ex. 4, § 1.2. It does not say that interest will be charged on unpaid interest. According to the Debtor, it therefore does not provide for compound interest, which means interest on interest.

I agree with the Debtor that this sentence is ambiguous. Compound interest, by definition, is interest paid on both principal and unpaid interest. As the Second Circuit has stated, "'[c]ompound interest' is interest paid on both principal and previously accumulated interest; at the end of each interest period, the accrued interest is added to the principal for purposes of future calculations of interest." *Themis Cap., LLC v. Dem. Rep. Congo*, 626 F. App'x 346, 349 (2d Cir. 2015) (quoting 72 N.Y. Jur. 2d Interest and Usury § 2).

It could be argued that, when the parties provided in this sentence that interest would be compounded monthly on "the principal sum of this Note," they contemplated that any unpaid interest would be added to principal on a monthly basis. This argument might be persuasive if this sentence were viewed in isolation. However, other provisions of the note and the loan agreement undercut this interpretation. For example, section 1.1(a) of the note says that "[i]nterest on the full Loan amount" shall accrue at the annual rate of 11.25 percent. Mestrezat Decl. (ECF No. 13), Ex. 4, § 1.1(a). The word "Loan" is defined as "the advances made by [Romspen] to [the Debtor] pursuant to [the loan] [a]greement." *Id.*, Ex. 1, Sched. I at 4. The term "advances," by its common understanding, means principal, not interest, since interest is not advanced; it merely accrues.

The provisions of the loan agreement, which are incorporated by reference in the note, reinforce this conclusion. Specifically, the loan agreement defines the word "Debt" to mean "all Indebtedness of [the Debtor] to [Romspen], including, without limitation, the outstanding principal

25

amount set forth in, and evidenced by, the Note, together with all interest accrued and unpaid thereon and all other sums due to [Romspen] in respect of the Loan under the Note, this Agreement, or any other Loan Document." *Id.*, Ex. 1, Sched. I at 2. Had the parties intended interest under the note to be compound, rather than simple, they could have provided that interest shall be calculated at the applicable interest rate on the Debt, with a capital D. Alternatively, they could have said interest will be calculated on principal plus any unpaid interest. They didn't say either of those things.

I find that, taken together, these provisions indicate that the parties intended interest to accrue at a simple rate, not a compound rate.

The Debtor points to one additional provision of the note, which it claims provides further support for the conclusion that interest under the note accrues at a simple, not a compound, rate. Specifically, the Debtor points to the last sentence of section 1.2, which states that "[t]he principle of deemed reinvestment of interest does not apply to any interest calculation under this Note." *Id.*, Ex. 4, § 1.2. The Debtor notes that the concept of deemed reinvestment of interest is often equated with compound interest and, on this ground, asks me to read this sentence to mean that the parties intended interest to be simple, not compound.

Romspen does not dispute that deemed reinvestment of interest is often associated with compound interest. However, Romspen contends that this concept can also have different meanings, and it argues that I should give it a different meaning here. Moreover, I should do so as a matter of Canadian law and practice, because Romspen—a Canadian-based lender—included the reference to deemed reinvestment of interest in the note as part of the disclosures required of Canadian lenders by the Interest Act of Canada. *See* Canada Act, 1982, c. I-15, *reprinted in* R.S.C. 1985, app II, no. 44 (Can.). To support its proposed interpretation of this provision, Romspen has

26

filed an appendix of Canadian legal sources, including a number of Canadian judicial decisions and a lengthy article from the *Alberta Law Review* addressing the concept of deemed reinvestment of interest under Canadian law.

If I had to rule on who has the better of this argument—that is, what effect to give to section 1.2's statement that deemed reinvestment of interest does not apply to the calculation of interest— I would be inclined to agree with the Debtor. This sentence, on its face, appears to support the conclusion that simple, not compound, interest is required. However, I am reluctant to rule on this issue, given Romspen's contention that the issue is governed by Canadian law. Although Romspen has filed an appendix of Canadian authorities on this issue, it has not offered any expert testimony on Canadian law, nor has it asked for leave to present expert testimony. As a result, I don't believe I have a sufficient record to rule on the meaning of the last sentence of section 1.2 under Canadian law.

Fortunately, I don't have to rule on this issue, because Romspen doesn't contend that the note's reference to deemed reinvestment of interest affirmatively cuts in its favor. It merely argues that I shouldn't give any weight to this sentence. I don't need to give weight to this sentence, because, as I just explained, the other provisions of the note establish that interest is computed at a simple, not a compound, rate.

Let me mention, finally, an argument that the Debtor preemptively addressed in its claim objection, assuming that Romspen would raise it. As it happened, Romspen did not make this argument, but for the purpose of completeness, I will address it. The argument rests on section 5.13 of the note, which provides in pertinent part as follows:

> In the event of a conflict between or among the terms, covenants, conditions, or provisions of the Loan Documents, the term(s), covenant(s), condition(s), and/or provision(s) that [Romspen] may elect to enforce from

> time to time so as to enlarge the interest of [Romspen] in its security, afford [Romspen] the maximum financial benefits or security for the debt, and/or provide [Romspen] the maximum assurance of payment of the Debt in full shall control.

Mestrezat Decl. (ECF No. 13), Ex. 4, § 5.13.

I find that section 5.13 does not apply to the compound interest issue. This section gives Romspen certain rights when two or more provisions of the loan documents conflict. For example, if section 1.2 unambiguously provided for compound interest but other sections provided for simple interest, Romspen might have a plausible argument under section 5.13 that it could rely on section 1.2 notwithstanding any contrary provisions in other sections of the note. However, as I've already ruled, section 1.2 is itself ambiguous as to whether compound interest is required. As a result, there's no conflict here between two provisions that mean different things. Rather, there's an ambiguous provision whose meaning is clarified by reference to other provisions. For that reason, section 5.13 does not apply.

### B. Extrinsic evidence

At oral argument, when I asked the parties what evidence they wished to present beyond the documents attached to their motion papers, the only potential topics counsel raised were the reasonableness of attorneys' fees and the accuracy of Romspen's calculations. Neither party asked me to consider any extrinsic evidence to aid in determining whether interest is simple or compound.

Subsequently, in a letter it filed shortly before the April 27, 2026 hearing, Romspen asked me to consider the second forbearance agreement as extrinsic evidence bearing on the compound interest issue. As I've noted, Schedule 1 to that agreement detailed the outstanding indebtedness that the Debtor then owed Romspen, including base interest, default interest, and a number of other

28

charges. It also provided that the parties to the agreement "hereby acknowledge and agree to the accuracy of all Recitals" in the agreement. Mestrezat Decl. (ECF No. 13), Ex. 13, 2. The most relevant recital was recital E, which provided: "As of July 21, 2023, the total amount of unpaid principal, accrued interest at the Interest Rate and Default Rate, and late charges owing under the loan is $22,913,432.49, as more particularly shown on the attached Schedule 1. The Unpaid Loan Amount is due and payable." *Id.* at 1.

According to Romspen, the interest amounts included in Schedule 1 to this agreement are sufficiently large that they could only be the result of compounding. Romspen argued that I should therefore treat this agreement as extrinsic evidence that the parties understood the note to require compound, not simple, interest. In response, Debtor's counsel disputed that the forbearance agreement showed that his client understood interest under the note to be compound, rather than simple. He argued that this forbearance agreement was presented to his client on a "take it or leave it" basis, and his client believed it had to sign the agreement without changes as the price of obtaining forbearance. According to Debtor's counsel, his client did not, to his knowledge, review the calculations and make any determination of whether they were accurate or whether they reflected compound interest.

I find that the limited evidence on this issue is inconclusive. It is possible that the forbearance agreement reflects the parties' understanding that interest would be calculated on a compound interest basis. But it is equally possible that the Debtor did not share that view but nevertheless was willing to agree to pay the amounts shown on Schedule 1 in order to obtain forbearance. Because neither Romspen nor the Debtor has provided any evidence on this issue beyond the forbearance agreement itself, I have no basis to make a finding as to which of these

two possible scenarios occurred. I therefore find that the forbearance agreement does not shed any light on whether the note provides for simple or compound interest.

## CONCLUSION

For the foregoing reasons, I will enter an order granting the Debtor's objection in part, denying it in part, and deferring my ruling in part until a final determination can be made as to whether Romspen is oversecured.

Dated: July 21, 2026
      New York, New York

                        /s/ Philip Bentley
                        Honorable Philip Bently
                        United States Bankruptcy Judge