UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK (MANHATTAN)

IN RE: . Case No. 25-11375
. Chapter 11
1300 DESERT WILLOW ROAD, LLC, .

. **NOT FOR PUBLICATION**

Debtor. .

**BENCH DECISION DENYING MOTIONS FOR RECONSIDERATION AND FOR A STAY PENDING APPEAL**[1]

APPEARANCES:

For the Debtor:

Bronson Law Offices, P.C.
By: H. BRUCE BRONSON, JR., ESQ.
480 Mamaroneck Avenue
Harrison, NY 10525-0023
(877) 385-7793

LAW OFFICE OF CHARLES A. HIGGS
By: CHARLES A. HIGGS, ESQ.
100 S. Bedford Rd., Ste. 340
Mount Kisco, NY 10549
(917) 673-3768

[1] This decision was dictated on the record of the October 16, 2026 continued hearing on these two motions. The Court has made minor edits to correct and clarify the transcript but has made no changes of substance. The decision assumes familiarity with the facts of the case, which are set forth in the Court's prior decisions. See In re 1300 Desert Willow Road, LLC, 2026 WL 2996610 (Bankr. S.D.N.Y. Oct. 4, 2026); In re 1300 Desert Willow Road, LLC, 2026 WL 2172297 (Bankr. S.D.N.Y. July 21, 2026); In re 1300 Desert Willow Road, LLC, 677 B.R. 176 (Bankr. S.D.N.Y. 2026).

Given the decision's origins as a bench ruling, it has a more conversational tone and fewer legal citations than a memorandum decision.

| | |
|---|---|
| For Romspen Investment LP, as Agent and Servicer for Lenders TIG Romspen US Master Mortgage LP and Fund Investment 149, LLC: | Bryan Cave Leighton Paisner LLP<br>By: JARRET P. HITCHING, ESQ.<br>One Wells Fargo Center, Suite 2150<br>Charlotte, NC 28202<br>(312) 602-5000 |
| | Bryan Cave Leighton Paisner LLP<br>By: KYLE S. HIRSCH, ESQ.<br>Two North Central Avenue<br>Suite 2100<br>Phoenix, AZ 85004<br>(602) 364-7000 |
| For Niagara Bottling LLC: | Pillsbury Winthrop Shaw Pittman<br>By: ANDREW VINCENT ALFANO, ESQ.<br>MICHAEL STAVROS, ESQ.<br>31 West 52nd Street<br>New York, NY 10019<br>(212) 858-1051 |
| | Pillsbury Winthrop Shaw Pittman<br>By: JOSHUA D. MORSE, ESQ.<br>Four Embarcadero Center, 22nd Floor<br>San Francisco, CA 94111<br>(415) 983-1202 |
| | Marshack Hays Wood LLP<br>By: DAVID A. WOOD, ESQ.<br>870 Roosevelt<br>Irvine, CA 92620<br>(949) 333-7777 |
| For Cascade Capital Group, LLC, Plan Administrator, by and through Mark Calvert, its Managing Director: | Law Office of David M. Banker, PLLC<br>By: DAVID M. BANKER, ESQ.<br>43 West 43rd Street, Suite 451<br>New York, NY 10036<br>(646) 402-5136 |
| For New Mexico Real Estate Advisors, Inc., d/b/a Colliers: | Dentons US LLP<br>By: HENRY THOMAS, ESQ.<br>1221 6th Avenue<br>New York, NY 10020<br>(212) 768-6700 |
| For David Ebrahimzadeh: | DAVID EBRAHIMZADEH (PRO SE)<br>150 East 78th Street<br>New York, NY 10075<br>(917) 207-7220 |

Also Present: SCOTT MESTREZAT
RYAN ALTMAN
UDAY GORREPATI
CASANDRA HOOKS
WILL UYESUGI
MARK CALVERT
JIM DOUNTAS
DENIS STRATFORD
ED WACKER

**Hon. Philip Bentley**
**U.S. Bankruptcy Judge**

THE COURT: We are here this afternoon on two motions filed by David Ebrahimzadeh, the debtor's principal. To be precise, Mr. Ebrahimzadeh is the 100 percent indirect owner of the debtor. And through another of his companies, he is the managing member of the debtor.

One of his two motions seeks reconsideration of two orders that I entered in late September. First, my order denying the debtor's motion for approval of exit financing, which I'll refer to as the exit financing motion and the exit financing order. And second, my order approving the sale of the debtor's real property to Niagara Bottling. And I'll refer to that motion and order as the sale motion and the sale order.

Mr. Ebrahimzadeh's second motion seeks a continued stay of the sale order pending the appeals that both the debtor and Mr. Ebrahimzadeh have filed from my two orders. The sale order was automatically stayed for 14 days under Bankruptcy

Rules 6004(h) and 6006(d).

In addition, on October 2, I entered an order shortening time on Mr. Ebrahimzadeh's two motions so that they could be heard yesterday, and also extending the statutory stay through the end of yesterday. At the conclusion of yesterday's hearing, I orally extended the stay for one more day, until midnight tonight, and each of the parties confirmed that they would honor that oral stay extension.

For the reasons I'm about to explain, I'm going to deny both motions. At the same time, I will exercise my discretion to grant a temporary stay, which I'll address further at the end of this ruling, to enable Mr. Ebrahimzadeh to seek a stay pending appeal from the district court.

Let me start with some procedural background. Most of the facts relevant to my decision today were set forth in the bench decision that I entered on October 4. See In re 1300 Desert Willow Road, LLC, 2026 WL 2996610 (Bankr. S.D.N.Y. Oct. 4, 2026). That was a cleaned-up version of the bench ruling I had issued at the conclusion of the September 10 hearing on the exit financing motion and the sale motion.

I won't repeat those facts today. Instead, I'll limit myself to a summary of the relevant procedural background, which unfortunately is somewhat lengthy and complicated. I'll try to summarize it as briefly as I can.

On September 10 of this year, as I mentioned, I held

a hearing on the exit financing and sale motions. The exit financing motion was heard on very short notice at the debtor's request. I therefore allowed the debtor and the plan administrator to make their objections orally at the hearing instead of requiring them to file objections in advance of the hearing.

As for the sale motion, only one party objected to that motion, the debtor. Mr. Ebrahimzadeh did not file an objection or a response of any sort to that motion. And at the September 10 hearing, Mr. Ebrahimzadeh appeared, but merely as an observer. He did not participate in any way.

At the conclusion of that hearing, I issued a bench ruling, which, as I just mentioned, I subsequently cleaned up and issued as a bench decision, which is my term for a slightly more formal version of a bench ruling.

For the reasons stated in my bench decision, I denied the exit financing motion, and I conditionally approved the sale order. Specifically, I gave additional time to the U.S. government to object to language that the plan administrator had recently asked be added to the sale order, providing that the sale would be free and clear of any forfeiture claim the government might have, arising out of the federal government's indictment of Mr. Ebrahimzadeh.

This language was discussed at some length at the September 10 hearing, and nobody objected, either to the

substance of this new free and clear provision or to the process I approved, that is, to my giving the government time to review the provision and decide whether to object to it or not.

As it turned out, the government subsequently informed the plan administrator that it did not object, and I then entered the sale order with this provision added on September 29. The next day, September 30, I entered an order denying the exit financing motion.

Going back to the September hearing, one other procedural issue that was raised there was the request of one of the parties to extend the deadline for the closing of the sale. Again, nobody objected to this request, and I therefore approved it, and when I entered the sale order on September 29, I included that extension as well.

Before I entered my two orders on September 29 and September 30, Mr. Ebrahimzadeh filed a number of papers, all of them in his individual capacity and all of them on a pro se basis. First, he filed a notice of appeal from my two bench rulings, even though those rulings had not yet been reduced to an order.

In addition, he filed two motions in this court, a motion for reconsideration of my bench ruling and a motion for a stay of the not yet entered sale order, pending his appeal of that order. I struck these two motions as premature because I

had not yet entered an order on either motion. I did this not just for procedural reasons but also for a substantive reason, namely that the order I eventually entered addressed and rendered moot some of the arguments that Mr. Ebrahimzadeh advanced in his motions. My order stated that the striking of these two motions was without prejudice to their being refiled at the proper time, that is, after I had entered orders on the two underlying motions.

On October 2, Mr. Ebrahimzadeh refiled his two motions, and to his credit he did modify them to take into account the provisions of the two orders that I entered. As I have already mentioned, I then entered an order shortening time on his two motions to allow them to be heard yesterday and also extending the stay of the sale order to yesterday.

Two parties, Romspen and Niagara Bottling, have filed objections to Mr. Ebrahimzadeh's two motions, and earlier this week Mr. Ebrahimzadeh filed another flurry of papers in support of his two motions -- a reply, plus a supplemental declaration and a supplement that amended the terms of some of the relief his motions seek.

One notable point that I should mention is that although the debtor has filed a notice of appeal, the debtor has not filed a motion for reconsideration of my bench rulings or my orders. And I believe that right up to this minute the debtor still has not filed a motion for a stay of the sale

order.

The debtor did email my chambers two nights ago, on Wednesday evening, papers asking me to enter an order to show cause setting a hearing as early as yesterday morning -- not much more than 12 hours after the emailing of these papers to chambers -- on a motion that the debtor proposed to file seeking a stay of my sale order.

By not filing the papers, the debtor was responding to a provision in my chambers rules that says that when parties seek an order to show cause the proper practice is usually to email the papers to chambers without filing them until I have granted the order to show cause and set a hearing date. The debtor was quite properly following that process.

I've reviewed this not-yet-filed stay motion that the debtor had emailed to my chambers, and as I told the new counsel that the debtor has hired to prosecute its appeal, Mr. Charles Higgs, at the conclusion of yesterday's hearing, I am not going to enter the order to show cause that he had submitted. I told him that, if he wishes to seek a stay from me, he needs to file his stay motion using regular notice, that is, the 14-day notice prescribed by the Bankruptcy Rules.

I told him that I don't think it's proper for me to shorten time on a motion that his client waited five weeks to file. And when I say five weeks, I'm referring to the fact that about five weeks passed between the September 10 hearing

date when I entered my bench ruling on the exit financing and sale motions and yesterday when he emailed his papers to chambers. By waiting five weeks to file its motion, the debtor created a self-imposed emergency, and I don't generally find that self-created emergencies are grounds to shorten time.

I expected the debtor to respond to my ruling by filing its stay motion today. I told Mr. Higgs yesterday that, as soon as he files the motion, I will if at all possible give him a hearing date 14 days after the filing date. That is, I will try to give him the promptest hearing date that the Bankruptcy Rules permit without shortening time.

Nevertheless, he has not yet filed a stay motion. The upshot is that, as of today, Mr. Ebrahimzadeh has filed a motion seeking to stay the sale order, but the debtor has not.

In addition, the debtor has not filed any response in support of or otherwise in response to either Mr. Ebrahimzadeh's reconsideration motion or his stay motion. And when I asked Mr. Ebrahimzadeh and the debtor about this yesterday, the clear impression I got from what he and counsel said and did not say was that the debtor's counsel was not willing to file the reconsideration motion or the stay motion. I did not inquire into the specific reasons why not because I don't want to invade privilege.

With the debtor's counsel unwilling to file those motions, Mr. Ebrahimzadeh decided to file the motions himself.

It's undisputed that he controls the debtor and has the complete ability to direct the debtor to file any motion he wants them to file. But he's chosen to file the motions in his individual capacity, even though the motions concern orders denying a motion that the debtor, not he, filed and granting another motion that the debtor, not he, objected to.

This choice he has made raises serious standing and waiver issues, which I will get to later in my decision. At the outset, I wanted to make the point that those issues are of Mr. Ebrahimzadeh's own making.

In addition, Mr. Ebrahimzadeh has chosen to represent himself on a pro se basis instead of hiring counsel. I asked him at yesterday's hearing why he had chosen to do that, because as far as I know, he is a man with a lot of financial and other resources. He is the polar opposite of the sort of indigent party that you would expect to appear pro se. And this is relevant to his motions because if he were an indigent pro se party, he would be entitled to a fair amount of latitude.

It is an important principle that the Court give latitude to pro se parties in many cases. I have given Mr. Ebrahimzadeh some latitude on account of his pro se status, but he is not entitled to nearly the amount of latitude, in my view, as an indigent pro se party would be.

Returning to and wrapping up the procedural

background: I held a lengthy hearing yesterday, which took up most of the day, on Mr. Ebrahimzadeh's two motions. The hearing was scheduled as a non-evidentiary hearing pursuant to Local Bankruptcy Rule 9014-2, which provides that, subject to certain exceptions that don't apply here, hearings in bankruptcy court generally consist of an initial non-evidentiary hearing, followed by an evidentiary hearing if a need for the presentation of evidence is demonstrated at the initial non-evidentiary hearing. The rule provides that the initial hearing will be non-evidentiary unless the Court has previously ordered otherwise. And in this case, I did not previously order otherwise.

During the hearing, however, it became apparent to me that it would be helpful to have the testimony of Mr. Mark Calvert, who is a managing director at Cascade Capital Group and serves as the debtor's plan administrator. Mr. Calvert, in that capacity, oversaw the marketing and sale of the debtor's property. In addition, by virtue of the role he often plays in real estate matters, Mr. Calvert has a fair amount of expertise in appraisals. I therefore concluded that it would be helpful to get his testimony on certain limited matters -- namely, the appraisal that I'll be discussing later in this ruling, plus issues relating to the potential amount of a bond.

My desire to have testimony from Mr. Calvert raised a procedural issue, namely, I had not given the parties advance

notice that this hearing would involve evidence. I dealt with that problem as follows: I told the parties there were two options. We could finish the non-evidentiary hearing and then shortly thereafter have an evidentiary follow-up hearing at which Mr. Calvert would testify. Or we could be a bit more efficient and simply fold Mr. Calvert's testimony into the hearing and, in effect, turn this non-evidentiary hearing into a limited evidentiary hearing.

Nobody objected to my following the latter process, so that's the approach I followed. So as not to prejudice the parties, I questioned Mr. Calvert, and then we took a break, after which other parties, including Mr. Ebrahimzadeh, questioned Mr. Calvert. Nobody complained that they were given inadequate time to prepare to question Mr. Calvert.

One final procedural point: Mr. Ebrahimzadeh has filed extensive motion papers, which appear to have been written in large part by AI. His papers, to my mind, raise real Rule 11 questions, because as we all know, AI can make egregious errors, and he's not in a position to evaluate whether there are errors. He could have hired a lawyer to do that, and he chose not to. And in fact, his papers egregiously fail to apply or even acknowledge the legal standards that govern his motions, his reconsideration motion in particular.

I'm mentioning this now in part because if Mr. Ebrahimzadeh continues to file papers of this sort, either

before me or in the district court, his behavior to date may be relevant to whether sanctions should be awarded for future conduct of this sort. I made a point of warning him at the October 15 hearing that, if he doesn't get a lawyer and have a lawyer exercise due diligence and responsibility in connection with his filings, he is at risk of sanctions. There is no question that the papers he has filed have caused the other parties to incur very substantial legal expense, as well as requiring this Court to spend a lot of time dealing with frivolous arguments.

That completes the procedural background. Let me now turn to the substance -- first Mr. Ebrahimzadeh's reconsideration motion and then his stay motion.

Mr. Ebrahimzadeh seeks reconsideration under both FRCP 59(e) and FRCP 60(b), as incorporated by Bankruptcy Rules 9023 and 9024, respectively. His motion papers don't address the standards for reconsideration, and as I'll explain shortly, he entirely fails to satisfy the standards for reconsideration for the great bulk of his motion.

The standards governing reconsideration motions are well known. They have been addressed in the briefs that the other parties have filed, and they've not been disputed by Mr. Ebrahimzadeh. As a district court in this district has stated, the standards governing reconsideration under Rules 59(e) and 60(b) "are the same, and a court may grant

reconsideration where the party moving for reconsideration demonstrates an 'intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" In re Facebook, Inc., IPO Secs. & Derivative Litig., 43 F.Supp. 3d 369, 373 (S.D.N.Y. 2014) (quoting Schoolcraft v. City of New York, 298 F.R.D. 134, 136 (S.D.N.Y. 2014)).

It is widely recognized that a party moving for reconsideration may not "advance new facts, issues, or arguments not previously presented to the Court." Christoforou v. Cadman Plaza N., Inc., 2009 WL 723003 at *7 (S.D.N.Y. 2009)(quoting Shamis v. Ambassador Factors Corp., 187 F.R.D. 148, 151 (S.D.N.Y. 1999)). See also Shamis, 187 F.R.D. at 151 ("to be entitled to re-argument, Plaintiffs must demonstrate that the Court overlooked controlling decisions or factual matters that were put before it on the underlying motion.").

The one exception to this general rule is that a reconsideration motion may rest on newly discovered evidence that was not available at the time of the hearing. This exception to the rule is expressly stated in FRCP 60(b)(2), which provides that reconsideration is appropriate when there is "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." Courts have also followed this exception on motions for reconsideration under FRCP 59. See, e.g., Marvin

v. Allen, 2025 WL 1911558 at *1 (S.D.N.Y. 2025)(holding that a Rule 59 motion cannot rest on "facts, issues, or arguments that were previously available but not presented to the Court") (quoting Azzarmi v. Neubauer, 2023 WL 6255678 at *1 (S.D.N.Y. 2023)).

A corollary to the rule permitting newly discovered evidence is that the evidence must be of facts that existed at the time of the hearing. Evidence of subsequent events cannot be used to support a reconsideration motion. See, e.g., Cambridge Valley Machining, Inc., v. Hudson MFG LLC, 2020 WL 5878444 at *3 (N.D.N.Y. 2020)(holding that facts that occurred after the hearing were not "new evidence" supporting reconsideration.).

Finally, it is settled that a motion for reconsideration is "an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." Redwood v. Purdue Pharma, L.P. (In re Purdue Pharma, L.P.), 2026 WL 2325232 at *1 (S.D.N.Y. 2026) (quoting Dimps v. New York State Dep't of Corr. & Cmty. Supervision, 2025 WL 2237408, at *1 (S.D.N.Y. 2025)).

Let me turn now to the grounds that Mr. Ebrahimzadeh has advanced for reconsideration. His papers make five principal arguments, which I will address shortly. In addition to those five main arguments, the papers make certain additional arguments in passing and without much, if any,

explanation. In addition, at yesterday's argument, Mr. Ebrahimzadeh made still more new arguments, which he had not made in his motion. I view all of these additional arguments as peripheral and lacking in merit, as well as untimely. I won't burden the record by trying to unpack and respond to every one of them. I'll say merely that I've considered each of these arguments and determined that none of them have merit.

Let me turn now to Mr. Ebrahimzadeh’s five main arguments. I'll start with the argument that I consider his primary argument -- the one he focused on most at yesterday's hearing, and the one that I think is his strongest argument.

This argument rests on new evidence of two sorts. First, an appraisal that values the debtor's property at $52.7 million, which is $22.7 million more than the $30 million purchase price Niagara Bottling is paying under the approved sale. And second, evidence that Mr. Ebrahimzadeh claims shows he is making progress toward obtaining binding commitments for the $33 million in financing that he's trying to raise on the debtor's behalf in order to pay off the Romspen loan.

Based on this new evidence, Mr. Ebrahimzadeh argues that I erred in approving the sale to Niagara Bottling and that instead I should have deferred approval of that sale to give him and the debtor more time to try to obtain and then seek my approval of financing that would enable the debtor to pay off

Romspen's secured claim.

I'm going to focus first, and principally, on the first of those two sorts of new evidence -- the appraisal that Mr. Ebrahimzadeh attached to his reconsideration motion -- because I think it's the most serious part of his motion.

That appraisal is dated September 8 of this year, just two days before the September 10 hearing. It was performed by Newmark Valuation & Advisory LLC at the request of one of the two lenders from which Mr. Ebrahimzadeh is trying to get financing, namely a lender by the name of Golden Bridge. The appraisal values the debtor's property at $52.7 million, based primarily on the use of a discounted cash flow method, which takes the debtor's projected future cash flows, capitalizes them after a few years, and discounts those values back to present value.

As I mentioned, the appraisal is dated September 8. In addition to being two days before the September 10 hearing, that date was after the completion of the auction of the debtor's property, in which Niagara Bottling's $30 million cash bid was the high bid.

I was quite surprised to learn of this appraisal. In my experience, when a property has recently been sold or, as in this case, is under contract to be sold, and then the property is appraised, one expects the appraisal to value the property at the sale price or close to the sale price because it's a

cardinal valuation principle that a property's value is the price a willing buyer in a robust market would pay. To see a disparity this large between the appraised value and the purchase price was particularly surprising to me given that Newmark Valuation and Advisory LLC is part of the larger Newmark Group, a global real estate and financial advisory firm that has a well-established reputation.

It's certainly true that the validity of this appraisal has not been tested yet. The appraisal has not been presented through the testimony of the professionals who prepared it, much less tested through discovery and cross-examination. But the fact that it was performed by a firm like Newmark, a large, well-known firm that's generally considered reputable, suggests that, at minimum, it was professionally done and is entitled to serious consideration. To my mind, the large disparity between the valuation and the sale price raised questions about whether a proper sale process was conducted, and whether I should perhaps reconsider my September 10 finding that the sale process was adequate and proper in all respects. More on that shortly.

At yesterday's hearing, no one from Newmark was present, to my knowledge. However, as I mentioned earlier, the debtor's plan administrator, Mr. Calvert, was present. I therefore asked Mr. Calvert to take the stand so that I and the parties present could question him about his evaluation of the

appraisal, as well as about certain factual issues relating to whether, if I were to grant a stay, I should require a bond and if so in what amount.

Based on the answers that Mr. Calvert gave to my questions and the questions of the various parties, including Mr. Ebrahimzadeh, the debtor and Romspen, my conclusion is that the appraisal does raise some grounds for concern.

In the first place, Mr. Calvert did not identify any aspects of the appraisal that struck him as clear errors. In addition, when I asked him whether he had any basis to think that Newmark's value conclusion might be materially wrong, he identified only one aspect of the appraisal that in his view raised real questions about the reliability of the $52.7 million valuation. He testified that he had questions about Newmark's choice of cap rate. That's short for capitalization rate. He added that, in his view, a 100 basis point change in the cap rate would change the ultimate valuation of this property by about 15 percent. He didn't elaborate further. He did add, quite understandably, that to be confident in his views of whether the appraisal was reliable or not, he would first want to talk to the people who prepared the appraisal so that he could be sure that he understood the analysis they conducted.

I asked Mr. Calvert whether the disparity between the appraisal and the sale price raised questions in his mind about

the adequacy of the sale process, and his answers were somewhat equivocal. He testified that, in his view, the marketing process was robust, but at the same time, he added that the marketing process may not have allowed a great deal of time for potential buyers to try to obtain financing.

Where does this leave us? This is a motion for reconsideration, and so the threshold question before me is whether the motion, including the facts about the appraisal that I've just described, establishes any of the recognized grounds for reconsideration.

As I noted earlier, one of the grounds for reconsideration, and the one that Mr. Ebrahimzadeh relies on for this part of his motion, is "the availability of new evidence." In re Facebook, 43 F.Supp. 3d at 373. It's clear under the case law, though, that the new evidence that a movant relies on has to be evidence that was not available at the time of the hearing. This presumably means not only that the movant was not in possession of the evidence, but also that it was not readily obtainable by him at that time. This follows from the plain meaning of the word "available," which is generally understood to include things that are readily obtainable. This interpretation is also supported indirectly by the express reference in F.R.C.P. 60(b)(2) to the exercise of "reasonable diligence" as one element in evaluating newly available evidence.

What does the evidence here tell us about whether the appraisal was available to Mr. Ebrahimzadeh at the time of the September 10 hearing? The declaration Mr. Ebrahimzadeh filed is notable both for what it says and for what it doesn't say. It says that he and the debtor received the Newmark appraisal after the September 10 hearing. It also says that at the time of the September 10 hearing, he was aware that the appraisal had been delivered to Golden Bridge, the senior lender, and that Golden Bridge considered it satisfactory. That's at paragraph 8 of his declaration.

But what does his declaration not say? It says nothing about whether he knew the appraisal valued the property at $52 million. It says nothing about whether he asked Golden Bridge about that subject, or whether he asked Golden Bridge to share the appraisal with him and let him use it at the September 10 hearing. Golden Bridge is aligned with Mr. Ebrahimzadeh and the debtor, in the sense that it shares their interest in persuading me to let the debtor go forward with the exit financing. If I don't approve that financing, which includes the Golden Bridge loan, then all the time and effort that Golden Bridge has put into evaluating whether to make the loan to the debtor would be for naught. One therefore would expect Golden Bridge to have told Mr. Ebrahimzadeh about this appraisal and to have offered to let him use it at the September 10 hearing.

Did that happen? We don't know. But we do know that the record contains no evidence that it didn't happen. And we also know that it's Mr. Ebrahimzadeh's burden to establish that the evidence on which he bases his reconsideration motion was not available to him at the time of the hearing. He has failed to meet that burden.

His failure to meet that burden had very substantial practical consequences. Had either he or the debtor put the appraisal into evidence at the September 10 hearing, I could have evaluated whether the sale process was adequate, as the plan administrator claims, or inadequate, as Mr. Ebrahimzadeh is now belatedly arguing. Had either the debtor or Mr. Ebrahimzadeh put the appraisal into evidence at the hearing, they would have had to put the Newmark appraiser on the stand. That's how one gets an appraisal into evidence. Had they done that, Romspen and the plan administrator and others could have cross-examined that appraiser and explored the soundness of the $52.7 million valuation. If that valuation is defective, that could have come out on cross-examination. If it's not, I might have given the appraisal significant weight.

In addition, if the debtor or Mr. Ebrahimzadeh had followed this path, they could have cross-examined the two witnesses that the plan administrator put on by declaration to testify that the sale process was proper and robust. I relied

on that testimony to find that the sale process was proper. The debtor and Mr. Ebrahimzadeh had every opportunity to cross-examine those witnesses. They also had every opportunity to put on their own competing witness – for example, an expert witness to say, I've reviewed the sale process, and it wasn't proper. They chose not to.

As a result, the opportunity to have a proper airing of these issues, which would have enabled me to rule on an informed basis about the value of this property and whether the sale process was proper, was lost. And it is far too late for Mr. Ebrahimzadeh to ask me now to revisit those issues. Mr. Ebrahimzadeh therefore has failed to meet his burden of showing that the evidence on which he's relying in the form of the appraisal is a proper basis for reconsideration.

Romspen and the plan administrator have argued that there's an independent ground to deny this portion of the reconsideration motion. They argue that because Mr. Ebrahimzadeh was not a party to the exit financing motion and didn't appear in support of it, and because he didn't object to the sale motion, he thereby waived or forfeited his right to seek reconsideration of my rulings on those two motions. Whether this is a valid ground to deny this portion of the reconsideration motion is not obvious to me. This is basically a waiver argument, and generally speaking, waivers must be knowing. You generally cannot waive something you're

not aware of. If it were true that Mr. Ebrahimzadeh didn't have actual or constructive knowledge of the appraisal, it's hard to see how he could be found to have waived his rights. But in any event, I don't need to reach this independent ground for denying this part of the reconsideration motion, and so I'm not going to rule on this argument.

As I mentioned earlier, the appraisal was not the only new evidence that Mr. Ebrahimzadeh relied on to support his argument that I should reconsider my approval of the sale. His declaration also says that, since the September 10 hearing, he has been making progress toward obtaining binding commitments for the $33 million of financing that he's trying to raise on the debtor's behalf.

There are multiple problems with this argument. First, his declaration does not say that he has obtained binding commitments for the $33 million in financing that he would need. It says merely that he's made progress toward getting a binding commitment for a portion of the financing, $23 million, from a potential senior lender, Golden Bridge. It does not say that he is anywhere close to obtaining a binding commitment from a junior lender to advance the additional $10 million that the debtor would need to pay off Romspen's loan.

In fact, at yesterday's hearing, Mr. Ebrahimzadeh admitted that the junior lender that he had previously been negotiating with has withdrawn, and he's now trying to get an

agreement with a new junior lender and to get the new junior lender to reach agreement with the senior lender over an intercreditor agreement. He says that they're making progress, and he's hopeful they'll reach agreement, but that is a long way from having a binding commitment now. So even if it were proper to consider this new evidence, it would not give me any reason to reconsider my prior decision denying the debtor's exit financing motion.

This conclusion is belt and suspenders, because it clearly is not proper to consider this evidence. This is not newly discovered evidence of facts that existed at the time of the September 10 hearing. Instead, it's evidence of events that occurred after that hearing. And as I've already discussed, evidence of subsequent events cannot be used to support a reconsideration motion. See Cambridge Valley Machining, 2020 WL 5878444, at *3.

As I stated at the September 10 hearing, and again at yesterday's hearing, if the debtor does eventually succeed in obtaining the financing it needs to pay off Romspen's loan -- and if the debtor is able to satisfy the other concerns I raised in my September 10 bench ruling about that financing, which are serious concerns, see In re 1300 Desert Willow Road, LLC, 2026 WL 2996610 at *2 -- the debtor would then be free to file a renewed motion for approval of exit financing. My order denying that motion was without prejudice to its renewal in

appropriate circumstances. A lot of time has passed since September 10, and the window is almost closed for the debtor to be able to file a motion of this sort. But if the debtor were somehow able to get this done before the sale that I've approved closes and if the debtor has not unduly delayed and is not asking me to unduly shorten time, I will entertain the motion. But that would be a renewed exit financing motion, not a reconsideration motion. That would be the proper way to address this issue.

Let me turn now to a third argument that Mr. Ebrahimzadeh advances in support of reconsideration. This third argument is also based on new evidence -- specifically, a lengthy declaration by William Robertson, a senior VP at Colliers International, which has served as the debtor's property manager for a number of years. The evidence concerns actions taken by Niagara Bottling, the winning bidder in the recent auction of the debtor's property and the approved buyer under my sale order. Importantly, for purposes of this part of the objection, one needs to know that Niagara Bottling is not only the approved buyer; it's also a long-time tenant of the debtor's property. At present, it's one of the two current tenants at the property.

Mr. Ebrahimzadeh argues that this declaration shows that over a course of years, Niagara engaged in bad faith conduct intended to depress the price of the property so that

Niagara could eventually acquire the property at a below-market price, as he says the sale order authorizes Niagara to do. He argues based on this evidence that the sale order should not have found that Niagara was a good faith purchaser entitled to the protections that Bankruptcy Code § 363(m) affords such a purchaser.

These are very serious allegations. However, as far as I can tell from the record, all of this evidence of Niagara's supposed bad faith conduct was available to Mr. Ebrahimzadeh at the time of the September 10 hearing. As far as I can tell, there's no reason whatsoever why the debtor or Mr. Ebrahimzadeh could not have presented this evidence at the September 10 hearing. It follows that this is not newly available evidence that can properly serve as the basis for a reconsideration motion. I will therefore deny this portion of the motion.

Let me turn finally and more briefly to Mr. Ebrahimzadeh's three remaining grounds for reconsideration. Each of these is a challenge to a particular provision of the sale order. First, he challenges the sale order provision that extended the sale closing deadline, also known as the outside closing date, for the sale to Niagara through October 20. Mr. Ebrahimzadeh argues that by extending the time for the parties to that sale to close but not giving the debtor additional time to try to obtain financing, the order provides

disparate treatment to those parties.

The most obvious problem with this argument is that Mr. Ebrahimzadeh has presented no proper basis for reconsideration. As I mentioned earlier, it's black-letter law that a party moving for reconsideration may not "advance new facts, issues, or arguments not previously presented to the court." Christoforou, 2009 WL 723003 at *7. The request to extend the closing deadline, which was ultimately reflected in the sale order, was made at the September 10 hearing. Both the debtor's counsel and Mr. Ebrahimzadeh attended that hearing. And although the issue was discussed at some length at that hearing and everybody present had the opportunity to object if they wished to do so, nobody objected, including the debtor and Mr. Ebrahimzadeh. Mr. Ebrahimzadeh therefore waived his right to object and cannot raise it now on a motion for reconsideration.

In addition, to the extent Mr. Ebrahimzadeh is arguing that he's entitled to reconsideration of this provision because it's clear error or would work a manifest injustice, I find that there's no basis whatsoever to reach such a conclusion. The reason this extension was needed was that Mr. Ebrahimzadeh was indicted last year by a federal grand jury on six federal felony fraud counts. Because of that indictment, the title insurer, shortly before the September 10 hearing, raised concerns that the federal government might seek

to assert a forfeiture claim against the property even after the sale of the property to Niagara. It's understandable that a title insurer would not want to take the risk of a forfeiture claim of that sort, which would put the title in jeopardy.

At the September 10 hearing, the plan administrator requested time to deal with that issue and proposed a method for dealing with it, which ultimately was successful. It's very hard for me to see how Mr. Ebrahimzadeh can argue with a straight face that the need for an extension that was occasioned by his own criminal indictment would somehow work a manifest injustice. The extension was clearly warranted. It’s not error, let alone clear error, and there's no basis to reconsider it.

Second, Mr. Ebrahimzadeh challenges the inclusion of language in paragraph 16 of the sale order which deals with the risk of a federal government forfeiture claim. This language provides that the sale to Niagara Bottling is free and clear of any forfeiture claim the federal government may have. The most obvious problem with Mr. Ebrahimzadeh's attempt to have me reconsider the inclusion of this language in the sale order is that this issue, too, was raised and discussed at some length at the September 10 hearing. At that hearing, this language was specifically described, and the plan administrator proposed putting the language in the draft order and circulating it to the federal government so the government could review it and

determine whether or not to object.

As it turned out, the government chose not to object, and as a result, when the time came for me to enter the sale order, I approved the inclusion of this free-and-clear language. Mr. Ebrahimzadeh had every opportunity to object to the inclusion of this language at the September 10 hearing, as did the debtor, and neither of them raised a peep. So the right to object has been waived.

In addition, to the extent Mr. Ebrahimzadeh is arguing that the inclusion of this language is clear error or would work a manifest injustice, I find that there's no basis for such a conclusion. This is language that's very beneficial to the debtor's estate and necessary to the closing of the sale that I have approved. Like the extension of the closing deadline, this language was needed because of Mr. Ebrahimzadeh's indictment, so I fail to see how he has any basis whatsoever to object to it.

Finally, Mr. Ebrahimzadeh challenges the last sentence of paragraph 24 of the sale order, arguing that it unduly restricts the debtor's right to pay off Romspen's secured claim. This point differs from the two points I just discussed in that Mr. Ebrahimzadeh has not waived his right to object to this language. This language, unlike the two provisions I just discussed, was not raised or addressed at the September 10 hearing. Instead, I added this language to the

sale order sometime after the hearing, and Mr. Ebrahimzadeh saw it for the first time when he saw the order I entered.

However, I see no basis whatsoever to reconsider the inclusion of this language. It's not clear error, nor does it work a manifest injustice. To the contrary, it's entirely proper. This language incorporates verbatim the language in the confirmation order that reserved Mr. Ebrahimzadeh's right to pay off Romspen's loan if he can. The sale order language adds that he cannot do so in violation of rights that the plan and the confirmation order give to the plan administrator. But that's something that goes without saying. Even if I hadn't put this in this order, nobody can take actions that violate rights that the plan and confirmation order have given to the plan administrator or to anyone else. So there's no basis that I can conceive of to conclude that this language infringes Mr. Ebrahimzadeh's rights.

That completes my discussion of the reconsideration motion. For these reasons, I will deny that motion.

Let me turn now to the stay motion, and this discussion will be briefer. The legal standards for a stay motion are addressed in Mr. Ebrahimzadeh's papers, and he gets them right. As he notes, the standard to obtain a stay pending appeal is essentially the same standard as is required to obtain a preliminary injunction. A movant must make a showing that addresses four factors: one, whether there is substantial

possibility of success on appeal; two, the risk of irreparable injury to the movant absent a stay; three, the lack of substantial harm to the opposing parties if a stay is granted; and four, the public interests that may be affected. See, e.g., In re Suprema Specialties Inc., 330 B.R. 93, 95 (Bankr. S.D.N.Y. 2005).

Courts in the Second Circuit have adopted conflicting approaches as to how to apply these standards. Some courts in this circuit require the moving party to satisfy all four factors, including showing a substantial possibility of success on appeal. More recent cases, however, apply a balancing test, which weighs the factors against each other and permits a lesser showing to satisfy some factors if there's a stronger showing as to others. Compare In re 491 Bergen Street Corp. 2025 Bankr. LEXIS 1439 at *7 (Bankr. S.D.N.Y 2025), holding that, "in accordance with the latest guidance, the Court will adopt the balancing of factors approach," with Turner v. Citizens Nat'l Bank (In re Turner), 207 B.R. 373, 375 (2nd Cir. B.A.P. 1997), holding that "[f]ailure to satisfy one prong of this standard for granting a stay will doom the motion."

Courts that have applied the first of these two tests, the balancing test, have held that "[t]he probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury the movant will suffer absent the stay. Simply stated, more of one excuses less of the

other." In re 473 W. End Realty Corp., 507 B.R. 496, 502 (Bankr. S.D.N.Y. 2014) (quoting Mohammed v. Reno, 309 F.3d 95, 101 (2d Cir. 2002)).

At the same time, the Second Circuit has held that when the movant fails to demonstrate any probability of success on appeal, a stay request may be denied regardless of how strongly the other factors support the stay. See Uniformed Fire Officers Ass'n v. de Blasio, 973 F.3d 41, 49 (2d Cir. 2020)("With likelihood of success totally lacking, the aggregate assessment of the factors bearing on issuance of a stay pending appeal cannot possibly support a stay.").

I don't need to choose between the two alternative formulations of the standard, because Mr. Ebrahimzadeh fails under either version. Mr. Ebrahimzadeh has no chance of winning his appeal, because he waived his right to appeal. His lack of any likelihood of success dooms his stay motion, as I just mentioned. See Uniformed Fire Officers Ass'n, 973 F.3d at 49.

It is settled that a party who does not preserve his arguments waives the ability to appeal later. See In re Nortel Networks Corp. Sec. Litig., 539 F.3d 129, 133 (2d Cir. 2008). As I've already discussed at some length, Mr. Ebrahimzadeh did not object to the sale motion, and he did not join the debtor's exit financing motion or appear in support of it in any way. Having taken no position in opposition to the one motion or in

support of the other, he cannot appeal my rulings on either of the two motions. Every argument he makes is a new argument, which he waived by not making it at the time of the September 10 hearing.

In light of this waiver it's not necessary for me to discuss the merits of Mr. Ebrahimzadeh's arguments. Nevertheless, I will note that his appeal, as presented in his stay motion, rests principally on the same five arguments that he advanced as his principal arguments on the reconsideration motion. And as I've already explained, I find that those arguments lack merit.

In light of my finding as to likelihood of success, it's also not necessary for me to address the remaining stay factors, because Mr. Ebrahimzadeh has no entitlement to a stay regardless. Nevertheless, I will briefly address factors 2, 3, and 4.

The second factor -- the risk of irreparable injury to the movant absent a stay -- does weigh in Mr. Ebrahimzadeh's favor, but only slightly. If the sale is consummated, the debtor will lose the property. The property will be sold to Niagara Bottling. As a result, the debtor will lose what Mr. Ebrahimzadeh believes is its equity in the property, that is, the difference between what he believes the property is worth and the amount of debt on the property. The amount of debt on the property is roughly $30 million, and if the

appraisal is correct, the property could be worth a good deal more than that.

The absence of a stay will deprive Mr. Ebrahimzadeh of the possibility of retaining that value through his ownership of the debtor. It's merely a possibility, however, because even if there were a stay, the debtor would only be able to retain the property if it were able to raise the financing that Mr. Ebrahimzadeh is trying to raise. And as I've mentioned in my prior decisions, including my October 4 bench decision, he has been saying for years that he's on the verge of obtaining financing that would enable the debtor to retain the property. So it's far from clear whether, even with a stay, he would succeed in raising that financing. In addition, because of his delays in obtaining financing, Mr. Ebrahimzadeh bears a large part of the responsibility for the delays that have made a stay potentially necessary. So for all of these reasons, although this factor does weigh in Mr. Ebrahimzadeh's favor, it only weighs in his favor to a modest degree.

The third factor, whether the stay would impose a substantial risk of loss on other parties, weighs quite heavily against a stay. The greatest risk of harm to other parties is that, if a stay were granted for more than a brief period of time -- if a stay were granted, that is, for the amount of time that it would take for the district court to rule not just on a

stay but on the merits -- there appears to be a genuine risk that Niagara might abandon the sale. Under the debtor's confirmed plan of liquidation, the proceeds of that sale will be used to pay the debtor's creditors in full. A loss of the Niagara sale potentially jeopardizes payment of the debtor's creditors in full. That's a serious risk, which weighs heavily against the stay.

The final factor is the balance of public interests, and I find that this factor also weighs against granting a stay. I confirmed a plan in this case over six months ago. The Bankruptcy Code favors finality and the maximization of estate value. A stay that would delay consummation of a confirmed plan is often detrimental to the public interest. See, e.g., my colleague Judge Mastando's recent decision in In re Eletson Holdings, Inc., 2025 WL 726248 (Bankr. S.D.N.Y 2025). And as I've discussed, a stay in this case would not just delay plan consummation; it could cause the confirmed plan to fail. The failure of a plan of liquidation that, if consummated, would pay creditors in full would be detrimental to the public interest.

Let me add a few more words about other aspects of the stay application. First, an update. I said near the beginning of my ruling that the debtor had not yet filed a motion in this Court to stay the sale order. I've been advised that during the course of this hearing -- that is, while I've

been reading this ruling -- the debtor has finally filed the stay motion that it had emailed to my chambers last night. So there is now a stay motion by the debtor before me. As I said, I'm not going to set it for a hearing in less than 14 days because the debtor waited so long to file the motion. It's entirely possible that by the time I hear it, and by the time my denial of that stay application, if that's what I do, gets up to the district court, it will be too late for any relief to be granted. Nevertheless, if that were to happen, that would be the direct consequence of decisions that the debtor has made in this case. And the debtor is the party most directly affected by whether or not its property is sold.

Let me turn finally to the issue of a bond. Mr. Ebrahimzadeh stated at the conclusion of yesterday's hearing that he would not be able to post a bond -- even a bond in the amount of $130,000 to $140,000, the amount that was discussed at yesterday's hearing based on Mr. Calvert’s testimony. An additional reason for denying Mr. Ebrahimzadeh's stay motion is that, even if he had satisfied the legal test for granting a stay, which he has not, he would also need to post a bond. That's in my discretion, but the case law puts the burden on a party seeking a stay pending appeal to establish that a bond should not be required, and he has not met that burden.

If hypothetically I were to grant the stay

Mr. Ebrahimzadeh has requested -- that is, a stay that continues until the district court rules on the merits -- I would find a large bond to be necessary, because a stay of that length of time would pose a big risk of loss to the estate, as I just explained. So the fact that I would require a bond and that it's clear he would not be able to post one is yet another reason to deny his stay application.

For all these reasons, I will deny Mr. Ebrahimzadeh's motion for a stay pending appeal. However, I will exercise my discretion to grant a temporary stay so that Mr. Ebrahimzadeh may seek a stay pending appeal from the district court. See, e.g., Ultimate Opportunities, LLC v. Plan Administrator, 2021 WL 11707937 at *3 (E.D.N.Y. 2021) (denying stay pending appeal, but exercising discretion to grant temporary stay to allow stay application to Second Circuit) (citing In re Albicocco, 2006 WL 2620464 at *5 (E.D.N.Y. 2006)).

If Mr. Ebrahimzadeh fails to file a motion for a stay pending appeal before the district court by next Wednesday, October 21, the temporary stay will expire at that time. If Mr. Ebrahimzadeh does file a stay motion in the district court by that deadline, the temporary stay will remain in effect until the district court decides the stay motion. It will then lapse unless the district court chooses to extend it.

This completes my bench ruling.

Dated: October 27, 2026
New York, New York

/s/ Philip Bentley
Honorable Philip Bentley
United States Bankruptcy Judge